# BLATCHFORD, COMMISSIONER, DEPARTMENT OF COMMUNITY AND REGIONAL AFFAIRS OF ALASKA *v.* NATIVE VILLAGE OF NOATAK ET AL.

No. 89–1782.   Argued February 19, 1991—Decided June 24, 1991

*Rex E. Lee* argued the cause for petitioner. On the briefs were *Charles E. Cole*, Attorney General of Alaska, *Douglas B. Bailey*, former Attorney General, and *Gary I. Amendola, Douglas K. Mertz, Jack B. McGee*, and *William F. Cummings*, Assistant Attorneys General.

*Lawrence A. Aschenbrenner* argued the cause for respondents. With him on the brief for respondent Native Village of Noatak were *Robert T. Anderson, William E. Caldwell, Carol H. Daniel,* and *Ralph W. Johnson. Michael J. Walleri* and *Alicemary L. Closuit* filed a brief for respondent Circle Village.*

JUSTICE SCALIA delivered the opinion of the Court.

We are asked once again to mark the boundaries of state sovereign immunity from suit in federal court. The Court of Appeals for the Ninth Circuit found that immunity did not extend to suits by Indian tribes, and Alaska seeks review of that determination.

## I

In 1980, Alaska enacted a revenue-sharing statute that provided annual payments of $25,000 to each "Native village government" located in a community without a state-chartered

---

*Briefs of *amici curiae* urging reversal were filed for the State of Alabama et al. by *Donald J. Hanaway,* Attorney General of Wisconsin, and *Charles D. Hoornstra,* Assistant Attorney General, and by the Attorneys General for their respective States as follows: *Don Siegelman* of Alabama, *Robert K. Corbin* of Arizona, *John Steven Clark* of Arkansas, *Duane Woodard* of Colorado, *Clarine Nardi Riddle* of Connecticut, *Robert A. Butterworth* of Florida, *Warren Price III* of Hawaii, *Jim Jones* of Idaho, *Frank J. Kelley* of Michigan, *Hubert H. Humphrey III* of Minnesota, *Mike C. Moore* of Mississippi, *Marc Racicot* of Montana, *Robert M. Spire* of Nebraska, *Brian McKay* of Nevada, *Hal Stratton* of New Mexico, *Nicholas J. Spaeth* of North Dakota, *Robert Henry* of Oklahoma, *Ernest D. Preate, Jr.,* of Pennsylvania, *T. Travis Medlock* of South Carolina, *Kenneth O. Eikenberry* of Washington, and *Joseph B. Meyer* of Wyoming; and for the Council of State Governments et al. by *Benna Ruth Solomon, Joyce Holmes Benjamin, Clifton S. Elgarten,* and *Luther Zeigler.*

Briefs of *amici curiae* urging affirmance were filed for the Native Village of Tanana et al. by *Lloyd Benton Miller, Eric Smith,* and *David S. Case;* and for the Metlakatla Indian Community by *Charles A. Hobbs* and *Christopher T. Stearns.*

*Arlinda F. Locklear, Howard Bichler, Bertram Hirsch,* and *Milton Rosenberg* filed a brief for the Miccosukee Tribe of Indians of Florida et al. as *amici curiae.*

municipal corporation. Alaska Stat. Ann. § 29.89.050 (1984). The State's attorney general believed the statute to be unconstitutional. In his view, Native village governments were "racially exclusive groups" or "racially exclusive organizations" whose status turned exclusively on the racial ancestry of their members; therefore, the attorney general believed, funding these groups would violate the equal protection clause of Alaska's Constitution. Acting on the attorney general's advice, the Commissioner of Alaska's Department of Community and Regional Affairs (petitioner here), enlarged the program to include all unincorporated communities, whether administered by Native governments or not. Shortly thereafter, the legislature increased funding under the program to match its increased scope. Funding, however, never reached the full $25,000 initially allocated to each unincorporated Native community.

The legislature repealed the revenue-sharing statute in 1985, see 1985 Alaska Sess. Laws, ch. 90, and replaced it with one that matched the program as expanded by the commissioner. In the same year, respondents filed this suit, challenging the commissioner's action on federal equal protection grounds, and seeking an order requiring the commissioner to pay them the money that they would have received had the commissioner not enlarged the program. The District Court initially granted an injunction to preserve sufficient funds for the 1986 fiscal year, but then dismissed the suit as violating the Eleventh Amendment. The Court of Appeals for the Ninth Circuit reversed, first on the ground that 28 U. S. C. § 1362 constituted a congressional abrogation of Eleventh Amendment immunity, *Native Village of Noatak* v. *Hoffman*, 872 F. 2d 1384 (1989) (later withdrawn), and then, upon reconsideration, on the ground that Alaska had no immunity against suits by Indian tribes. 896 F. 2d 1157 (1989). We granted certiorari *sub nom. Hoffman* v. *Native Village of Noatak*, 498 U. S. 807 (1990).

## II

The Eleventh Amendment provides as follows:

"The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State."

Despite the narrowness of its terms, since *Hans* v. *Louisiana*, 134 U. S. 1 (1890), we have understood the Eleventh Amendment to stand not so much for what it says, but for the presupposition of our constitutional structure which it confirms: that the States entered the federal system with their sovereignty intact; that the judicial authority in Article III is limited by this sovereignty, *Welch* v. *Texas Dept. of Highways and Public Transportation*, 483 U. S. 468, 472 (1987) (plurality opinion); *Employees of Dept. of Public Health and Welfare of Mo.* v. *Department of Public Health and Welfare of Mo.*, 411 U. S. 279, 290–294 (1973) (MARSHALL, J., concurring in result); and that a State will therefore not be subject to suit in federal court unless it has consented to suit, either expressly or in the "plan of the convention." See *Port Authority Trans-Hudson Corp.* v. *Feeney*, 495 U. S. 299, 304 (1990); *Welch, supra,* at 474 (plurality opinion); *Atascadero State Hospital* v. *Scanlon*, 473 U. S. 234, 238 (1985); *Pennhurst State School and Hospital* v. *Halderman*, 465 U. S. 89, 99 (1984).

Respondents do not ask us to revisit *Hans;* instead they argue that the traditional principles of immunity presumed by *Hans* do not apply to suits by sovereigns like Indian tribes. And even if they did, respondents contend, the States have consented to suits by tribes in the "plan of the convention." We consider these points in turn.

In arguing that sovereign immunity does not restrict suit by Indian tribes, respondents submit, first, that sovereign

immunity only restricts suits by *individuals* against sovereigns, not by *sovereigns* against sovereigns, and as we have recognized, *Oklahoma Tax Comm'n* v. *Citizen Band of Potawatomi Tribe of Okla.*, 498 U. S. 505, 509 (1991), Indian tribes are sovereigns. Respondents' conception of the nature of sovereign immunity finds some support both in the apparent understanding of the Founders and in dicta of our own opinions.[1] But whatever the reach or meaning of these early statements, the notion that traditional principles of sovereign immunity only restrict suits by individuals was rejected in *Principality of Monaco* v. *Mississippi*, 292 U. S. 313 (1934). It is with that opinion, and the conception of sovereignty that it embraces, that we must begin.

In *Monaco*, the Principality had come into possession of Mississippi state bonds, and had sued Mississippi in federal court to recover amounts due under those bonds. Mississippi defended on grounds of the Eleventh Amendment, among others. Had respondents' understanding of sovereign immunity been the Court's, the Eleventh Amendment would not have limited the otherwise clear grant of jurisdic-

---

[1] As Alexander Hamilton said: "It is inherent in the nature of sovereignty, not to be amenable to the suit of an *individual* without its consent." The Federalist No. 81, pp. 548–549 (J. Cooke ed. 1961) (emphasis added and deleted). James Madison expressed a similar understanding at the Virginia Convention ("It is not in the power of *individuals* to call any state into court"), 3 J. Elliot, The Debates in the Several State Conventions on the Adoption of the Federal Constitution 533 (2d ed. 1863) (emphasis added), as did Chief Justice Marshall ("[A]n *individual* cannot proceed to obtain judgment against a state, though he may be sued by a state"), *id.*, at 555–556 (emphasis added). In *United States* v. *Texas*, 143 U. S. 621, 645 (1892), we adverted to respondents' distinction explicitly, describing *Hans* v. *Louisiana*, 134 U. S. 1 (1890), as having "proceeded upon the broad ground that 'it is inherent in the nature of sovereignty not to be amenable to the suit of an *individual* without its consent,'" 143 U. S., at 645–646, and concluding that "the suability of one government by another government . . . does no violence to the inherent nature of sovereignty." *Id.*, at 646.

tion in Article III to hear controversies "between a State . . . and foreign States." But we held that it did.

> "Manifestly, we cannot rest with a mere literal application of the words of § 2 of Article III, or assume that the letter of the Eleventh Amendment exhausts the restrictions upon suits against non-consenting States. Behind the words of the constitutional provisions are postulates which limit and control. . . . There is . . . the postulate that States of the Union, still possessing attributes of sovereignty, shall be immune from suits, without their consent, save where there has been a 'surrender of this immunity in the plan of the convention.' The Federalist, No. 81." *Monaco, supra,* at 322–323 (footnote omitted).

Our clear assumption in *Monaco* was that sovereign immunity extends against both individuals and sovereigns, so that there must be found inherent in the plan of the convention a surrender by the States of immunity as to either. Because we perceived in the plan "no ground upon which it can be said that any waiver or consent by a State of the Union has run in favor of a foreign State," *id.,* at 330, we concluded that foreign states were still subject to the immunity of the States.

We pursue the same inquiry in the present case, and thus confront respondents' second contention: that the States waived their immunity against Indian tribes when they adopted the Constitution. Just as in *Monaco* with regard to foreign sovereigns, so also here with regard to Indian tribes, there is no compelling evidence that the Founders thought such a surrender inherent in the constitutional compact.[2]

---

[2] The only evidence alluded to by respondents is a statement by President Washington to Chief Cornplanter of the Seneca Nation:

"Here, then, is the security for the remainder of your lands. No State, nor person, can purchase your lands, unless at some public treaty, held under the authority of the United States.

We have hitherto found a surrender of immunity against particular litigants in only two contexts: suits by sister States, *South Dakota* v. *North Carolina*, 192 U. S. 286, 318 (1904), and suits by the United States, *United States* v. *Texas*, 143 U. S. 621 (1892). We have not found a surrender by the United States to suit by the States, *Kansas* v. *United States*, 204 U. S. 331, 342 (1907); see Jackson, The Supreme Court, the Eleventh Amendment, and State Sovereign Immunity, 98 Yale L. J. 1, 79–80 (1988), nor, again, a surrender by the States to suit by foreign sovereigns, *Monaco, supra.*

Respondents argue that Indian tribes are more like States than foreign sovereigns. That is true in some respects: They are, for example, domestic. The relevant difference between States and foreign sovereigns, however, is not domesticity, but the role of each in the convention within which the surrender of immunity was for the former, but not for the latter, implicit. What makes the States' surrender of immunity from suit by sister States plausible is the mutuality of that concession. There is no such mutuality with either foreign sovereigns or Indian tribes. We have repeatedly held that Indian tribes enjoy immunity against suits by States, *Potawatomi Tribe, supra,* at 509, as it would be absurd to suggest that the tribes surrendered immunity in a convention to which they were not even parties. But if the convention could not surrender *the tribes'* immunity for the benefit of the *States,* we do not believe that it surrendered the States' immunity for the benefit of the tribes.

## III

Respondents argue that, if the Eleventh Amendment operates to bar suits by Indian tribes against States without their

"If . . . you have any just cause of complaint against [a purchaser], and can make satisfactory proof thereof, the federal courts will be open to you for redress, as to all other persons." 4 American State Papers, Indian Affairs, Vol. 1, p. 142 (1832). But of course, denying Indian tribes the right to sue States in federal court does not disadvantage them in relation to "all other persons." Respondents are asking for access more favorable than that which others enjoy.

consent, 28 U. S. C. § 1362 operates to void that bar. They press two very different arguments, which we consider in turn.

A

In *United States* v. *Minnesota,* 270 U. S. 181 (1926), we held that the United States had standing to sue on behalf of Indian tribes as guardians of the tribes' rights, and that, since "the immunity of the State is subject to the constitutional qualification that she may be sued in this Court by the United States," *id.,* at 195, no Eleventh Amendment bar would limit the United States' access to federal courts for that purpose. Relying upon our decision in *Moe* v. *Confederated Salish and Kootenai Tribes,* 425 U. S. 463 (1976), respondents argue that we have read § 1362 to embody a general delegation of the authority to sue on the tribes' behalf from the Federal Government back to tribes themselves. Hence, respondents suggest, because the United States would face no sovereign immunity limitation, in no case brought under § 1362 can sovereign immunity be a bar.

Section 1362 provides as follows:

> "The district courts shall have original jurisdiction of all civil actions, brought by any Indian tribe or band with a governing body duly recognized by the Secretary of the Interior, wherein the matter in controversy arises under the Constitution, laws, or treaties of the United States."

What is striking about this most unremarkable statute is its similarity to any number of other grants of jurisdiction to district courts to hear federal-question claims. Compare it, for example, with § 1331(a) as it existed at the time § 1362 was enacted:

> "The district courts shall have original jurisdiction of all civil actions wherein the matter in controversy exceeds the sum or value of $10,000 exclusive of interest and costs, and arises under the Constitution, laws, or

treaties of the United States." 28 U. S. C. § 1331(a) (1964 ed.).

Considering the text of § 1362 in the context of its enactment, one might well conclude that its *sole* purpose was to eliminate any jurisdictional minimum for "arising under" claims brought by Indian tribes. Tribes already had access to federal courts for "arising under" claims under § 1331, where the amount in controversy was greater than $10,000; for all that appears from its text, § 1362 merely extends that jurisdiction to claims below that minimum. Such a reading, moreover, finds support in the very title of the Act that adopted § 1362: "To amend the Judicial Code to permit Indian tribes to maintain civil actions in Federal district courts without regard to the $10,000 limitation, and for other purposes." 80 Stat. 880.

*Moe*, however, found something more in the title's "other purposes"—an implication that "a tribe's access to federal court to litigate [federal-question cases] would be *at least in some respects* as broad as that of the United States suing as the tribe's trustee," 425 U. S., at 473 (emphasis added). The "respect" at issue in *Moe* was access to federal court for the purpose of obtaining injunctive relief from state taxation. The Tax Injunction Act, 28 U. S. C. § 1341, denied such access to persons other than the United States; we held that § 1362 revoked that denial as to Indian tribes. *Moe* did not purport to be saying that § 1362 equated tribal access with the United States' access *generally*, but only "at least in some respects," 425 U. S., at 473, or "in certain respects," *id.*, at 474. Respondents now urge us, in effect, to eliminate this limitation utterly—for it is impossible to imagine any more extreme replication of the United States' ability to sue than replication even to the point of allowing unconsented suit against state sovereigns. This is a vast expansion upon *Moe*. Section 1341, which *Moe* held § 1362 to eliminate in its application to tribal suits, was merely a limitation that Congress itself had created—commiting state tax-injunction suits

to state courts as a matter of comity. Absent that statute, state taxes could constitutionally be enjoined. See *Will* v. *Michigan Dept. of State Police,* 491 U. S. 58, 71, n. 10 (1989).[3] The obstacle to suit in the present case, by contrast, is a creation not of Congress but of the Constitution. A willingness to eliminate the former in no way bespeaks a willingness to eliminate the latter, especially when limitation to "certain respects" has explicitly been announced.

Moreover, as we shall discuss in Part III–B, our cases require Congress' exercise of the power to abrogate state sovereign immunity, where it exists, to be exercised with unmistakeable clarity. To avoid that difficulty, respondents assert that § 1362 represents not an abrogation of the States' sovereign immunity, but rather a *delegation* to tribes of the Federal Government's exemption from state sovereign immunity. We doubt, to begin with, that that sovereign exemption *can* be delegated—even if one limits the permissibility of delegation (as respondents propose) to persons on whose behalf the United States itself might sue. The consent, "inherent in the convention," to suit by the United States—at the instance and under the control of responsible federal officers— is not consent to suit by anyone whom the United States might select; and even consent to suit by the United States for a particular person's benefit is not consent to suit by that person himself.

But in any event, assuming that delegation of exemption from state sovereign immunity is theoretically possible, there is no reason to believe that Congress ever contemplated such

---

[3] Such injunction suits can only be brought against state officers in their official capacity and not against the State in its own name. *Missouri* v. *Fiske,* 290 U. S. 18, 27 (1933). Respondents argue that since the plaintiffs in *Moe* v. *Confederated Salish and Kootenai Tribes,* 425 U. S. 463 (1976), named the State of Montana as a defendant, as well as individual officers, the decision in that case held that § 1362 eliminated not only the statutory bar of § 1341 but sovereign immunity as well. We think not. Since Montana had not objected in this Court on sovereign immunity grounds, its immunity had been waived and was not at issue.

a strange notion. Even if our decision in *Moe* could be regarded as in any way related to sovereign immunity, see n. 3, *supra*, it could nevertheless not be regarded as in any way related to congressional "delegation." The opinion does not mention that word, and contains not the slightest suggestion of such an analysis. To say that "§ 1362 . . . suggests that in certain respects tribes suing under this section were to be accorded treatment similar to that of the United States had it sued on their behalf," 425 U. S., at 474, does not remotely imply delegation—only equivalence of treatment. The delegation theory is entirely a creature of respondents' own invention.

### B

Finally, respondents ask us to recognize § 1362 as a congressional abrogation of Eleventh Amendment immunity. We have repeatedly said that this power to abrogate can only be exercised by a clear legislative statement. As we said in *Dellmuth* v. *Muth*, 491 U. S. 223 (1989):

> "To temper Congress' acknowledged powers of abrogation with due concern for the Eleventh Amendment's role as an essential component of our constitutional structure, we have applied a simple but stringent test: 'Congress may abrogate the States' constitutionally secured immunity from suit in federal court only by making its intention unmistakably clear in the language of the statute.'" *Id.*, at 227–228.

We agree with petitioner that § 1362 does not reflect an "unmistakably clear" intent to abrogate immunity, made plain "in the language of the statute." As we have already noted, the text is no more specific than § 1331, the grant of general federal-question jurisdiction to district courts, and no one contends that § 1331 suffices to abrogate immunity for all federal questions.[4]

---

[4] In asserting that § 1362's grant of jurisdiction to "all civil actions" suffices to abrogate a State's defense of immunity, *post*, at 795–796, the dis-

Respondents' argument, however, is not that § 1362 is a "clear statement" under the standard of *Dellmuth*, but rather that it *was* a sufficiently clear statement under the standard of *Parden* v. *Terminal Railway of Alabama Docks Dept.*, 377 U. S. 184 (1964), the existing authority for "abrogation" at the time of § 1362's enactment in 1966. In *Parden*, we found a sufficiently clear intent to avoid state immunity in a statute that subjected to liability "every" common carrier in interstate commerce, where the State, after the statute's enactment, chose to become a carrier in interstate commerce. *Id.*, at 187–188. Similarly, respondents argue, a statute that grants jurisdiction to district courts to hear "all civil actions, brought by any Indian tribe" should constitute a sufficiently clear expression of intent to abrogate immunity. *Dellmuth* is not to the contrary, respondents maintain, since the statute there was enacted in the mid-1970's, long after the rule of *Parden* had been drawn into question. *Dellmuth, supra*, at 231.

We shall assume for the sake of argument (though we by no means accept) that Congress must be presumed to have had as relatively obscure a decision as *Parden* in mind as a backdrop to all its legislation. But even if Congress were aware of *Parden*'s minimal clarity requirement, nothing in *Parden* could lead Congress to presume that that requirement applied to the *abrogation* of state immunity. *Parden* itself neither mentioned nor was premised upon abrogation. Its theory was that, by entering a field of economic activity that is federally regulated, the State impliedly "consent[s]" to be

sent has just repeated the mistake of the Court in *Chisholm* v. *Georgia*, 2 Dall. 419 (1793), see *id.*, at 434–450 (Iredell, J., dissenting), the case that occasioned the Eleventh Amendment itself. The fact that Congress grants *jurisdiction* to hear a claim does not suffice to show Congress has abrogated all *defenses* to that claim. The issues are wholly distinct. A State may waive its Eleventh Amendment immunity, and if it does, § 1362 certainly would grant a district court jurisdiction to hear the claim. The dissent's view returns us, like Sisyphus, to the beginning of this 200-year struggle.

bound by that regulation and to be subject to suit in federal court on the same terms as other regulated parties, thus "waiv[ing]" its Eleventh Amendment immunity. 377 U. S., at 186. Not until 1976 (10 years after the passage of § 1362) did we first acknowledge a congressional power to abrogate state immunity—under § 5 of the Fourteenth Amendment. *Fitzpatrick* v. *Bitzer*, 427 U. S. 445 (1976). Thus, *Parden* would have given Congress no reason to believe it could abrogate state sovereign immunity and gives us no reason to believe that Congress intended abrogation by a means so subtle as § 1362. At the time § 1362 was enacted, abrogation would have been regarded as such a novel (not to say questionable) course that a general "arising under" statute like § 1362 would not conceivably have been thought to imply it. We conclude that neither under the current standard of *Dellmuth* nor under any standard in effect at the time of *Parden* was § 1362 an abrogation of state sovereign immunity.[5]

## IV

Finally, respondents argue that even if the Eleventh Amendment bars their claims for damages, they still seek injunctive relief, which the Eleventh Amendment would not bar. The Court of Appeals, of course, did not address this point, and we leave it for that court's initial consideration on remand.

The judgment of the Court of Appeals is reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

JUSTICE BLACKMUN, with whom JUSTICE MARSHALL and JUSTICE STEVENS join, dissenting.

The Court today holds that our Eleventh Amendment precludes Native American tribes from seeking to vindicate in

---

[5] Because we find that § 1362 does not enable tribes to overcome Alaska's sovereign immunity, we express no view on whether these respondents qualify as "tribes" within the meaning of that statute.

federal court rights they regard as secured to them by the United States Constitution. Because the Court resolves this case through reliance on a doctrine I cannot accept, and because I believe its construction of the pertinent jurisdictional statute to be otherwise flawed, I dissent.

## I

As some of us previously have stated, see *Atascadero State Hospital* v. *Scanlon*, 473 U. S. 234, 302 (1985) (dissenting opinion), I do not believe the Eleventh Amendment is implicated by a suit such as this one, in which litigants seek to vindicate federal rights against a State. In my view, the Amendment has no application outside the context of State/citizen and State/alien diversity suits.* Put another way, "[t]here simply is no constitutional principle of state sovereign immunity, and no constitutionally mandated policy of excluding suits against States from federal court." *Id.*, at 259 (Brennan, J., dissenting).

The substantial historical analysis that supports this view already has been exhaustively detailed, see *id.*, at 258–302 (Brennan, J., joined by MARSHALL, BLACKMUN, and STEVENS, JJ., dissenting); *Welch* v. *Texas Dept. of Highways and Public Transportation*, 483 U. S. 468, 497 (1987) (Brennan, J., joined by MARSHALL, BLACKMUN, and STEVENS, JJ., dissenting); *Pennsylvania* v. *Union Gas Co.*, 491 U. S. 1, 23 (1989) (STEVENS, J., concurring); *Pennhurst State School and Hospital* v. *Halderman*, 465 U. S. 89, 140–159 (1984) (STEVENS, J., joined by Brennan, MARSHALL, and BLACKMUN, JJ., dissenting), and I shall not repeat it here. It bears emphasis, however, that the Court need not have compounded the error of *Hans* v. *Louisiana*, 134 U. S. 1

---

*The Eleventh Amendment reads: "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State."

(1890), and its progeny by extending the doctrine of state sovereign immunity to bar suits by tribal entities, which are neither "Citizens of another State," nor "Citizens or Subjects of any Foreign State."

## II

Even assuming that the State at one time may have possessed immunity against tribal suits, that immunity was abrogated by Congress when, in 1966, 80 Stat. 880, it enacted 28 U. S. C. § 1362. The majority rejects this argument, holding that § 1362 cannot authorize respondents' suit because the statute's language does not reflect an "unmistakably clear" intent to abrogate the States' sovereign immunity. *Ante*, at 786. I have never accepted the validity of that so-called "clear-statement rule" and I remain of the view, expressed by Justice Brennan for four of us in *Atascadero*, that such "special rules of statutory drafting are not justified (nor are they justifiable) as efforts to determine the genuine intent of Congress . . . . [T]he special rules are designed as hurdles to keep the disfavored suits out of the federal courts." 473 U. S., at 254.

Even if I were to accept the proposition that the clear-statement rule at times might serve as a mechanism for discerning congressional intent, I surely would reject its application here. Despite the Court's attempt to give it a constitutional cast, the clear-statement rule, at bottom, is a tool of statutory construction like any other. So it must be, for the Judiciary has no power to redraw legislative enactments; where Congress has the authority to regulate a sphere of activity, we simply must do our best to determine whether it has done so in any particular instance. The majority's rule is one method for accomplishing that task. It is premised on the perception that Congress does not casually alter the "balance of power" between the Federal Government and the States. *Id.*, at 242. Because federal intrusion into state authority is the unusual case, and because courts are to use caution in determining when their own jurisdiction

has been expanded, *id.*, at 243, this Court has erected the clear-statement rule in order to be certain that abrogation is Congress' plan.

Whatever the validity of that determination may be generally, it cannot extend to matters concerning federal regulation of Native American affairs; in that sphere of governmental operations, the "balance of power" always has weighed heavily against the States and in favor of the Federal Government. Indeed, "[t]he plenary power of Congress to deal with the special problems of Indians is drawn both explicitly and implicitly from the Constitution itself." *Morton* v. *Mancari*, 417 U. S. 535, 551–552 (1974).

Illustrative of this principle are our cases holding that the law of the State is generally inapplicable to Native American affairs, absent the consent of Congress. See, *e. g.*, *Worcester* v. *Georgia*, 6 Pet. 515 (1832). Chief Justice Marshall explained for the Court in *Worcester* that a federally recognized tribe

> "is a distinct community, occupying its own territory, with boundaries accurately described, in which the laws of [the State] can have no force, and which the citizens of [the State] have no right to enter, but with the assent of the [tribes] themselves, or in conformity with treaties, and with the acts of Congress. The whole intercourse between the United States and this nation, is, by our Constitution and laws, vested in the government of the United States." *Id.*, at 561.

Despite the States' undeniable interest in regulating activities within its borders, and despite traditional principles of federalism, the States' authority has been largely displaced in matters pertaining to Native Americans. See *The Kansas Indians*, 5 Wall. 737 (1867) (finding state taxes inapplicable to tribal lands despite partial assimilation of tribe into white society); *United States* v. *Kagama*, 118 U. S. 375 (1886) (sustaining validity of a prosecution of Native Americans in federal court under the Indian Major Crimes Act). Moreover,

federal displacement of state authority regarding Native American affairs has not been limited to the geographic boundaries of "Indian country," see *Antoine* v. *Washington,* 420 U. S. 194 (1975) (holding that Congress may constitutionally inhibit a State's exercise of its police power over non-Indian land through federal legislation ratifying an agreement with a tribe), nor to state regulations that directly infringe upon tribal self-government. See *McClanahan* v. *Arizona State Tax Comm'n,* 411 U. S. 164, 179–180 (1973).

Thus, in this area, the pertinent "balance of power" is between the Federal Government and the tribes, with the States playing only a subsidiary role. Because spheres of activity otherwise susceptible to state regulation are, "according to the settled principles of our Constitution, . . . committed exclusively to the government of the Union," *Worcester* v. *Georgia,* 6 Pet., at 561, where Native American affairs are concerned, the presumptions underlying the clear-statement rule, and thus the rule itself, have no place in interpreting statutes pertaining to the tribes.

Employing the traditional tools of statutory interpretation, I conclude that Congress intended, through § 1362, to authorize constitutional claims for damages by tribes against the States. Section 1362 provides:

> "The district courts shall have original jurisdiction of *all* civil actions, brought by any Indian tribe or band with a governing body duly recognized by the Secretary of the Interior, wherein the matter in controversy arises under the Constitution; laws, or treaties of the United States." (Emphasis added.)

The majority notes, correctly, that this language is no broader than that of 28 U. S. C. § 1331(a), as it existed at the time § 1362 was enacted. *Ante,* at 784. As the preceding discussion makes clear, however, this is an area in which "a page of history is worth a volume of logic." *New York Trust Co.* v. *Eisner,* 256 U. S. 345, 349 (1921). A review of the

history of the latter statute reveals that Congress intended § 1362 to have a broader reach.

Prior to 1966, the Indian tribes were largely dependent upon the United States Government to enforce their rights against state encroachment. See, *e. g.*, *United States* v. *Minnesota*, 270 U. S. 181 (1926). This arrangement derived from the historic trust relationship between the tribes and the United States. See F. Cohen, Handbook of Federal Indian Law 308 (1982 ed.). In seeking judicial protection of tribal interests, the Federal Government, of course, was unrestrained by the doctrine of state sovereign immunity. *United States* v. *Minnesota*, 270 U. S., at 195, citing *United States* v. *Texas*, 143 U. S. 621 (1892).

In 1966, Congress enacted 28 U. S. C. § 1362 as part of a larger national policy of "self-determination" for the Native American peoples. See M. Price & R. Clinton, Law and the American Indian 86–91 (2d ed. 1983). Consistent with that policy, "Congress contemplated that § 1362 would be used particularly in situations in which the United States suffered from a conflict of interest or was otherwise unable or unwilling to bring suit as trustee for the Indians." *Arizona* v. *San Carlos Apache Tribe*, 463 U. S. 545, 560, n. 10 (1983). In other words, Congress sought to eliminate the tribes' dependence upon the United States for the vindication of federal rights in the federal courts.

In light of that legislative purpose, we held in *Moe* v. *Confederated Salish and Kootenai Tribes*, 425 U. S. 463 (1976), that the Tax Injunction Act, 28 U. S. C. § 1341, does not bar an action to enjoin the collection of state taxes brought by a tribe pursuant to § 1362, although it precludes such a suit by a private litigant. Construing § 1362, we identified a congressional intent that "a tribe's access to federal court to litigate a matter arising 'under the Constitution, laws, or treaties' would be at least in some respects as broad as that of the United States suing as the tribe's trustee." 425 U. S., at 473. Because the Federal Government could have brought

such a suit on the tribes' behalf, see *Heckman* v. *United States*, 224 U. S. 413 (1912), we held that the tribes were similarly empowered by § 1362.

I agree with respondents that the litigation authority bestowed on the tribes through § 1362 also includes the right to bring federal claims against the States for damages. The legislative history of the statute reveals Congress' intention that the tribes bring litigation "involving issues identical to those" that would have been raised by the United States acting as trustee for the tribes. H. R. Rep. No. 2040, 89th Cong., 2d Sess., 2 (1966) (House Report). There is no reason to believe that this authority would be limited to prospective relief in the broad range of suits brought against the States.

Fundamentally, the vindication of Native American rights has been the institutional responsibility of the Federal Government since the Republic's founding. See, *e. g.*, *Cherokee Nation* v. *Georgia*, 5 Pet. 1, 17 (1831). Section 1362 represents a frank acknowledgment by the Government that it often lacks the resources or the political will adequately to fulfill this responsibility. Given this admission, we should not lightly restrict the authority granted the tribes to defend their own interests. Rather, the most reasoned interpretation of § 1362 is as a congressional authorization to bring those suits that are necessary to vindicate fully the federal rights of the tribes. It hardly requires explication that monetary remedies are often necessary to afford such relief. Providing "the means whereby the tribes are assured of the same judicial determination whether the action is brought in their behalf by the Government or by their own attorneys," House Report, at 2–3, necessarily entails access to monetary redress from the States where federal rights have been violated.

In resisting this conclusion, the majority asserts that, because the Tax Injunction Act is merely a congressional enactment while the doctrine of sovereign immunity is a constitu-

tional one, a "willingness to eliminate the former in no way bespeaks a willingness to eliminate the latter." *Ante*, at 785. But the premise does not lead to the conclusion. Congress, through appropriate legislation, may abrogate state sovereign immunity, just as it may repeal or amend its own prior enactments. Moreover, the Tax Injunction Act, like the sovereign immunity doctrine, is rooted in historical notions of federalism and comity. See *Fair Assessment in Real Estate Assn., Inc.* v. *McNary*, 454 U. S. 100, 103 (1981), and cases cited therein. In light of these parallels, I find the expansive congressional purpose the Court identified in *Moe* to provide substantial support for the proposition that § 1362 was intended to convey federal jurisdiction over "*all* civil actions," § 1362 (emphasis added), brought by recognized tribes that the Government could have brought on their behalf.

"Finally, in construing this 'admittedly ambiguous' statute, *Board of Comm'rs* v. *Seber*, [318 U. S. 705, 713 (1943)], we must be guided by that 'eminently sound and vital canon,' *Northern Cheyenne Tribe* v. *Hollowbreast*, 425 U. S. 649, 655 n. 7 (1976), that 'statutes passed for the benefit of dependent Indian tribes . . . are to be liberally construed, doubtful expressions being resolved in favor of the Indians.' *Alaska Pacific Fisheries* v. *United States*, 248 U. S. 78, 89 (1918)." *Bryan* v. *Itasca County*, 426 U. S. 373, 392 (1976). Unlike the ill-conceived interpretive rule adopted so recently in *Atascadero*, this canon of construction dates back to the earliest years of our Nation's history. See, *e. g.*, *Worcester* v. *Georgia*, 6 Pet., at 582; *The Kansas Indians*, 5 Wall. 737 (1867); *Choate* v. *Trapp*, 224 U. S. 665, 675 (1912). Indeed, it is rooted in the unique trust relationship between the tribes and the Federal Government that is inherent in the constitutional plan. See U. S. Const., Art. I, § 8, cl. 3; Art. I, § 2, cl. 3. In light of this time-honored principle of construction, it requires no linguistic contortion to read § 1362's grant of federal jurisdiction over "all civil actions" to encom-

pass all tribal litigation that the United States could have brought as the tribes' guardian.

## III

Having concluded that respondents' suit may be brought in federal court, I agree with the Court of Appeals that respondents are recognized "tribe[s] or band[s]" for purposes of § 1362, and that they have alleged a federal cause of action. Accordingly, I would affirm the judgment of the Court of Appeals. I respectfully dissent from this Court's reversal of that judgment.