NAVAJO NATION, Plaintiff–Appellee,

and

Wallace Watchman, Mary Ann Watchman; Linda Frank; Irene Benally; Pauline Pinto Begay; Mary Laphie; Esther Lee; Elizabeth Roy; Irene Dick; Lucille Benally; Esther B. Joe, Plaintiffs–Intervenors

v.

STATE OF NEW MEXICO; Juan R. Vigil, in his official capacity as Secretary of the New Mexico Human Services Department, Defendants–Appellants.

No. 91–2187.

United States Court of Appeals, Tenth Circuit.

Sept. 22, 1992.

Susan K. Rehr, Asst. Gen. Counsel, New Mexico Human Services Dept., Santa Fe, N.M., for defendants-appellants.

Henry S. Howe, Navajo Nation Dept. of Justice, Window Rock, Ariz., for plaintiff-appellee.

* Honorable Richard D. Rogers, United States District Judge for the District of Kansas, sitting by designation.

Before HOLLOWAY and SEYMOUR, Circuit Judges, and ROGERS, District Judge.*

SEYMOUR, Circuit Judge.

Each year the federal government provides a sum of money for human services to each state under Title XX of the Social Security Act, 42 U.S.C. § 1397 (1981). This appeal arises out of New Mexico's decision in 1985 to cut by more than forty percent the portion of these funds it had previously allocated to the Navajo Nation for home care, from $466,277 to $278,000, in order to fund foster care citizen review boards. The record amply supports the district court's finding that the cut was motivated in part by discriminatory intent in violation of the Equal Protection Clause of the Fourteenth Amendment. We therefore affirm.

· I.

New Mexico's Human Services Department receives and administers Title XX block grants, offering social services to its residents through both direct and contract services. Direct services are operated and staffed by state employees. Contract services are performed by independent service providers, either government entities or non-profit organizations, which accept state funds annually in exchange for servicing particular needs and populations. Because of the Navajo Nation's unique linguistic, cultural, and economic needs, the state has chosen not to offer direct home care to Navajos, but rather to provide services pursuant to contracts with the Nation. The Nation then provides social services to its members through two Navajo social service agencies.

In each of fiscal years 1982, 1983 and 1984, the Navajo Nation received $466,277 for home care contracts.[1] In 1985, the state followed its standard procedure of soliciting requests for contracts, evaluating the requests, and awarding selected contracts. The Navajo Nation submitted its

1. Because of a change in the fiscal year, the 1982 fiscal "year" was only nine months long. The figure given here for fiscal 1982 is an annualized value.

request, and the state initially recommended a contract of $446,277, the amount of the previous year's contract minus $20,000 that the Nation had underspent.

The district court found that the 1985 recommendation, like the others, would have been adopted unchanged had the state not found itself with a budget shortfall in the spring of 1985. In November 1984, the state of New Mexico entered into a consent decree in the case of *Wolfe v. State of New Mexico*, No. 80–623 (D.N.M. filed Nov. 21, 1984). This stipulated court order required the state to form citizen review boards to oversee foster child placement, at an estimated cost of $315,000. The Human Services Department initially approached the state legislature for the additional funds, but was able to obtain only $127,000. After examining its other human services programs, the state took the remaining $188,000 required for the citizen review boards from the Navajo Nation home care contract.

Following a three-day bench trial, the district court held that the cut in funding was discriminatory on its face because it singled out Navajos for unfavorable treatment. The court held alternatively that the cut was motivated by discriminatory intent and had a disparate impact on the Navajo community. The state argues on appeal that the court misinterpreted the law and made clearly erroneous fact-findings. *See Bose Corp. v. Consumers Union*, 466 U.S. 485, 501, 104 S.Ct. 1949, 1959, 80 L.Ed.2d 502 (1984).

## II.

The district court held the spending cut facially discriminatory. It was thus held presumptively invalid because it was not narrowly tailored to serve a compelling government interest and less burdensome alternatives were available. *See Plyler v. Doe*, 457 U.S. 202, 217, 102 S.Ct. 2382, 2395, 72 L.Ed.2d 786 (1982); *Personnel Adm'r v. Feeney*, 442 U.S. 256, 272, 99 S.Ct. 2282, 2292, 60 L.Ed.2d 870 (1979); *Dunn v. Blumstein*, 405 U.S. 330, 343, 92 S.Ct. 995, 1003, 31 L.Ed.2d 274 (1972). The state's decision to cut $188,000 from the

Navajo Nation's home care budget did have an immediate, direct, and predictable consequences affecting the Navajos alone. Unlike a state-sponsored employment test on which racial minorities tend to receive lower results, *see Washington v. Davis*, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976), or a zoning ordinance which affects a disproportionately large number of minorities, *see Village of Arlington Hts. v. Metropolitan Hous. Dev. Corp.*, 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977), the spending cut challenged here resulted in adverse consequences exclusively effecting the Navajo community.

We are troubled, however, about evaluating the state's conduct here under the standards developed for facially discriminatory state action. The targeted impact on the Navajo Nation from the spending cuts can be viewed as existing because the Nation and the state of New Mexico have agreed that home services are best provided for that community through the Nation itself. If the Navajo population were to receive home care services directly from the state social service agency, as part of the entire direct services budget, the decision to underfund the relevant programs would not specifically affect a racially identifiable population. We would instead be presented with a clear "disparate impact" case which, as we discuss below, would be subject to a different set of legal standards. We need not decide in this case whether a decrease in state funding funneled through a race or nationality-based organization is facially discriminatory, however, because the district court's decision stands easily on its alternative disparate impact analysis.

A disparate impact challenge, unlike a facial challenge, requires a showing of discriminatory intent. *Arlington Heights*, 429 U.S. at 265, 97 S.Ct. at 563. It is not necessary to show that discrimination was the sole, or even the primary, motivation; indeed, the Supreme Court has commented on the futility of such an inquiry. *Id.* Rather,

"[d]iscriminatory purpose" ... implies that the decisionmaker ... selected or reaffirmed a particular course of action

*at least in part "because of,"* not merely "in spite of," its adverse effects on an identifiable group.

*Feeney,* 442 U.S. at 279, 99 S.Ct. at 2296 (emphasis added).[2] "Discriminatory intent is simply not amenable to calibration. It either is a factor that has influenced the legislative choice or it is not." *Id.* at 277, 99 S.Ct. at 2295. If discrimination is a factor, the state action violates the Equal Protection Clause guarantee against invidious discrimination.

*Arlington Heights* lists some of the factors that may be relevant to a finding of discrimination, particularly where the evidence is circumstantial rather than direct.

The historical background of the decision is one evidentiary source, particularly if it reveals a series of official actions taken for invidious purposes. The specific sequence of events leading up to the challenged decision also may shed some light on the decisionmaker's purposes.... Departures from the normal procedural sequence also might afford evidence that improper purposes are playing a role....

The legislative or administrative history may be highly relevant, especially where there are contemporary statements by members of the decisionmaking body....

429 U.S. at 267–68, 97 S.Ct. at 564–65 (citations omitted).

■ The district court wrote a lengthy and thoughtful opinion accurately stating the law regarding discriminatory impact challenges and finding facts on the basis of that law. The record shows that Juan Vigil, Secretary of the Human Services Department at the time of the challenged decision, had initially approved the Navajo Nation's 1985 contract for $446,277, based on the community's needs and other relevant factors. The district court found that "[t]he funding reduction occurred outside the normal procedural process and without considering the normal substantive criteria. Consideration of the usual factors would have led to a decision to fund the Navajo Nation for home care services at least in the amount of $446,277." Appellants' App. at 70. This departure from the normal procedures for making funding decisions supports the district court's finding of discriminatory intent.

The district court also found that defendant Vigil "knew that only Navajos would suffer the consequences" of the spending cut, *id.* at 71, and that "[t]he decision to obtain funding for the citizen review boards only from the Navajo contract was based primarily on concerns about political retaliation if cuts were made elsewhere in the state," *id.* at 71–72. This latter finding is supported by evidence that the Navajos are disadvantaged in the political process in New Mexico, and by comments from a Department official that "political" constraints produced a decision to cut contract services rather than direct home care services which were budgeted at more than $800,000, *see* rec., Tr. 9/12/90 at 25.

The state asserts that the Human Services Department officials first decided to take the $188,000 from contract, as opposed to direct, services to avoid massive layoffs. This justification, however, does not further the state's argument. A cut in the direct services budget would have destroyed state jobs; cutting the contract services instead forced any necessary layoffs into the non-state sector. When the state then decided to take the entire amount from the Navajo Nation contract, these layoffs fell exclusively on Navajo Nation service providers. The district court found that "[t]he 40% reduction in the Navajo Tribe's home care program re-

---

**2.** The state argues that *Personnel Adm'r v. Feeney,* 442 U.S. 256, 272, 99 S.Ct. 2282, 2292, 60 L.Ed.2d 870 (1979), limits *Village of Arlington Hts. v. Metropolitan Hous. Dev. Corp.,* 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977), by requiring that discriminatory intent be the *primary* motivation of the defendant. This argument relies on the state's omission of several key words whenever it quotes *Feeney,* and is so trivial that we would not address it separately did it not form the backbone of the state's appeal. In response, we need only reiterate the governing standard and emphasize the words the state frequently omits: discriminatory motive exists when action is taken *"at least in part* 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *Feeney,* 442 U.S. at 279, 99 S.Ct. at 2296 (emphasis added).

sulted in the termination of 40% of the home care workers in Navajo Indian Country." Appellants' App. at 70. Thus, the state's decision actually supports the court's finding that the state chose to place the full burden on the Nation because the state would lose less politically by doing so.

The state also claims that home care was a low priority contract service, and that of the home care contracts, only the contract to the Navajo Nation was sizeable enough to remain viable after so large a cut. The district court found to the contrary that "[o]ther contracts could have been reduced along with reductions to the Navajo contract without destroying the viability of their programs." *Id.* at 71. The record supports this finding. Were the home care budget divided among Navajos and non-Navajos, the Department could have taken at least some of the shortfall from the $276,990 budgeted for non-Navajos. Only by dividing the home care budget for non-Navajos into smaller component parts does the state create a financing scheme in which the Navajos alone have a large budget.

To the extent the district court's finding of discriminatory intent involved a credibility determination, we give "due regard ... to the opportunity of the trial court to judge the credibility of the witnesses." Fed.R.Civ.P. 52(a); *Anderson v. City of Bessemer City,* 470 U.S. 564, 573, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985). Based on our review of the record and giving due regard for the district court's assessment of the witnesses' credibility, we cannot say the court's conclusion that "defendants were motivated in part by an intent to discriminate against Navajo Indians," Appellants' App. at 73, was clearly erroneous.

### III.

After finding liability, the district court enjoined the state from "failing to fund the Navajo Nation's Title XX contract services for the present and subsequent years at less than $446,277, unless a lower level of funding can be justified by the need for those services on the Navajo Reservation or in Navajo Indian Country," and from "administering and allocating Title XX funds in any manner that fails to ensure the availability of Title XX services to Navajo Indians at the same level, relative to their need, as those services are available to all New Mexicans." [3] *Id.* at 75. In so doing, the court relied on *Papasan v. Allain,* 478 U.S. 265, 282, 106 S.Ct. 2932, 2942, 92 L.Ed.2d 209 (1986). The court recognized that the Eleventh Amendment bars the award of money damages against the state, citing *Blatchford v. Native Village of Noatak,* —— U.S. ——, 111 S.Ct. 2578, 115 L.Ed.2d 686 (1991). *See* Appellants' App. at 74. However, the court held that *Papasan* permits declaratory and injunctive relief "even if such a remedy requires the expenditure of state funds in order to insure 'compliance *in the future* with a substantive federal-question determination,'" *id.* (quoting *Papasan,* 478 U.S. at 282, 106 S.Ct. at 2942).

The district court was correct that an injunctive award is not invalid merely because it requires the state to expend money from its treasury in order to comply. *Edelman v. Jordan,* 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974). The award may not, however, compensate the plaintiff for the government's past illegal acts; it may only remedy a present and ongoing violation, in this case an ongoing disparity between the level of funding to Navajos and non-Navajos. *See Papasan,* 478 U.S. at 278–82, 106 S.Ct. at 2940–42.

The district court's order meets the requirements of *Papasan.* When a state begins with a system in which funds are being distributed equitably among various racial groups, and then cuts one group's funding discriminatorily without showing that that group's need has lessened, the undeniable result is a disparity in the ade-

---

**3.** The state argues at some length that since its decision was rational and not invidious, the court has impermissibly interfered with the administrative process. *See Dandridge v. Williams,* 397 U.S. 471, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970). *Dandridge*'s prescribed rationality review for state spending decisions applies only when the decision is *not* in fact invidious. Since the state *did* discriminate invidiously, the district court had authority to impose a remedy.

quacy of services provided among groups. If the Navajo Nation was receiving equal treatment before the unilateral cut, it must afterwards have been receiving proportionately less. Moreover, because each year's funding is determined according to the previous year's, the disparity continues to this day. Absent a showing that the Navajos' need for home care services has decreased, or that other legitimate factors make a decrease in the Navajo Nation's home care budget necessary, the state may not continue its disparately low funding based on the unconstitutional cut.

The judgment of the district court is AFFIRMED.