FILED
United States Court of Appeals
Tenth Circuit

November 17, 2016

Elisabeth A. Shumaker
Clerk of Court

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

DANIJELA MOJSILOVIC;
ALEKSANDAR MOJSILOVIC,

     Plaintiffs - Appellants,

v.                                                                      No. 15-6151

STATE OF OKLAHOMA EX REL. THE
BOARD OF REGENTS FOR THE
UNIVERSITY OF OKLAHOMA,

     Defendant - Appellee,

and

PURE PROTEIN LLC; WILLIAM
HILDEBRAND,

     Defendants.
_____

**Appeal from the United States District Court**
**for the Western District of Oklahoma**
**(D.C. No. 5:14-CV-00886-R)**
_____

Submitted on the briefs:[*]

George S. Freedman and Sarah Rowe Clutts, Lester, Spencer Fane, LLP, Edmond,
Oklahoma, for Plaintiffs-Appellants.

_____

[*] After examining the briefs and appellate record, this panel has determined
unanimously that oral argument would not materially assist in the determination of
this appeal. _See_ Fed. R. App. P. 34(a)(2); 10th Cir. R. 34.1(G). The case is therefore
ordered submitted without oral argument.

Gus H. Buthman and Gauri D. Nautiyal, Office of Legal Counsel, University of Oklahoma, Norman, Oklahoma; Clyde A. Muchmore and Evan G. E. Vincent, Crowe & Dunlevy, A Professional Corporation, Oklahoma City, Oklahoma, for Defendant-Appellee.

_____

Before **MATHESON**, **McKAY**, and **O'BRIEN**, Circuit Judges.

_____

**McKAY**, Circuit Judge.

_____

Danijela and Aleksandar Mojsilovic appeal the dismissal of their damages claim under the Trafficking Victims Protection Reauthorization Act (TVPRA), 18 U.S.C. § 1595, which provides a civil remedy for victims of forced labor. The Mojsilovics claim the University of Oklahoma, through one of its agents, forced them to work by threatening their immigration status, but the district court concluded the University was entitled to sovereign immunity. We exercise jurisdiction under 28 U.S.C. § 1291 and affirm the district court's judgment.

I

The Mojsilovics are Serbian scientists recruited and hired by the University of Oklahoma to serve as research assistants at the University's Health Sciences Center. In that capacity, Aleksandar was hired to conduct DNA sequencing and tissue typing for research and clinical studies; Danijela was hired to make transfectants and tissue cultures. The Mojsilovics were retained by the University through the H-1B visa program, and they were supervised by Dr. William Hildebrand, the director of the medical research laboratory at the Health Sciences Center. Dr. Hildebrand also owns

2

a biotechnology company called Pure Protein, which, through a contractual arrangement, shares the University's facilities to perform similar work.

According to the Mojsilovics, shortly after they were hired, Dr. Hildebrand demanded that they also work for Pure Protein. He allegedly required them to work longer hours than permitted by their visa applications, without pay, and threatened to have their visas revoked if they objected. Dr. Hildebrand became verbally abusive at times, and because he was authorized to make hiring and firing decisions, the Mojsilovics claimed they feared he would take action against their immigration status if they did not comply with his demands.

The Mojsilovics eventually filed suit, naming the University, Dr. Hildebrand, and Pure Protein as defendants. In a four-count complaint, they claimed violations of the TVPRA's forced labor provision, 18 U.S.C. § 1589, the TVPRA's human trafficking provision, *id.* § 1590, the Fair Labor Standards Act (FLSA), 29 U.S.C. § 216(b) (permitting employees to recover for unpaid overtime), and the Oklahoma Protection of Labor Act (OPLA), Okla. Stat. tit. 40, § 165.9 (permitting employees to recover for unpaid wages). All claims were premised on Dr. Hildebrand's threats to have the Mojsilovics deported if they refused to perform additional work for Pure Protein without pay. They sought damages under the TVPRA's civil remedy provision, 18 U.S.C. § 1595, as well as declaratory and injunctive relief, liquidated and compensatory damages, costs, and attorney's fees.

Defendants filed separate motions to dismiss, which the district court granted in part and denied in part with respect to Dr. Hildebrand and Pure Protein; those

3

rulings are not implicated in this appeal.[1]  For its part, the University argued (among other things) that as a state entity, it was entitled to sovereign immunity.  In response, the Mojsilovics conceded that sovereign immunity barred their FLSA and OPLA claims.  But they argued that sovereign immunity posed no bar to their TVPRA claims because the statute was enacted under Congress's Thirteenth Amendment authority to abolish involuntary servitude.  According to the Mojsilovics, the States surrendered sovereign immunity for claims of involuntary servitude by ratifying the Thirteenth Amendment.  And in any event, they argued, the statutory language of the TVPRA expressly abrogates sovereign immunity for "[w]hoever" engages in prohibited conduct, thus manifesting a clear intent to abrogate sovereign immunity of the States.  18 U.S.C. §§ 1589, 1595.  The district court rejected these arguments and dismissed the Mojsilovics' claims.  This appeal followed.[2]

## II

We review de novo the district court's dismissal based on sovereign immunity. *Peterson v. Martinez*, 707 F.3d 1197, 1205 (10th Cir. 2013).  "A foundational premise of the federal system is that States, as sovereigns, are immune from suits for damages, save as they elect to waive that defense."  *Coleman v. Court of Appeals of Md.*, ___ U.S. ___, 132 S. Ct. 1327, 1333 (2012).  A well-established exception to

---

[1] The surviving claims against Dr. Hildebrand and Pure Protein remain pending in the district court, which certified its order dismissing the claims against the University as a final, appealable judgment.  *See* Fed. R. Civ. P. 54(b).

[2] The Mojsilovics appeal only the dismissal of their forced labor claim under the TVPRA, not the disposition of their FLSA, OPLA, or human trafficking claims. *See* Aplt. Br. at 4 n.1.

4

this principle, however, is that Congress may abrogate the States' immunity. *Id.* "[T]o determine whether Congress has abrogated the States' sovereign immunity, we ask two questions: first, whether Congress has unequivocally expressed its intent to abrogate the immunity, and second, whether Congress has acted pursuant to a valid exercise of power." *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 55 (1996) (citation, brackets and internal quotation marks omitted).

In answering the first question—whether Congress intended to abrogate state sovereign immunity—we employ a "simple but stringent test: Congress may abrogate the States' constitutionally secured immunity from suit in federal court only by making its intention *unmistakably clear* in the language of the statute." *Kimel v. Fla. Bd. of Regents*, 528 U.S. 62, 73 (2000) (emphasis added) (internal quotation marks omitted). A general authorization for suit is insufficient to abrogate the States' sovereign immunity. *Atascadero State Hosp. v. Scanlon*, 473 U.S. 234, 246 (1985), *superseded by statute*, 42 U.S.C. § 2000d-7(a), *as recognized in Lane v. Pena*, 518 U.S. 187, 198 (1996); *accord Blatchford v. Native Vill. of Noatak*, 501 U.S. 775, 786 n.4 (1991) ("The fact that Congress grants *jurisdiction* to hear a claim does not suffice to show Congress has abrogated all *defenses* to that claim.").

For example, in *Coleman*, the Court concluded Congress made "unmistakably clear" its intent to abrogate the States' immunity by specifying in the language of the relevant statute that any "public agency" could be sued, defining that term to include "both the government of a State or political subdivision thereof and any agency of a State, or a political subdivision of a State." 132 S. Ct. at 1333 (ellipsis and internal

5

quotation marks omitted).  Similarly, in *Seminole Tribe*, the Court found

"unmistakably clear" evidence that Congress intended to abrogate the States'

immunity because "the State" was identified as the appropriate defendant in a lawsuit

brought under the statute at issue.  517 U.S. at 56-57.

By contrast, the TVPRA identifies as a criminal defendant in a forced labor

case "[w]hoever" engages in prohibited conduct:

> (a) *Whoever* knowingly provides or obtains the labor or services of a
> person by any one of, or by any combination of, the following means--
>
> (1) by means of force, threats of force, physical restraint, or threats of
> physical restraint to that person or another person;
>
> (2) by means of serious harm or threats of serious harm to that person or
> another person;
>
> (3) by means of the abuse or threatened abuse of law or legal process; or
>
> (4) by means of any scheme, plan, or pattern intended to cause the
> person to believe that, if that person did not perform such labor or
> services, that person or another person would suffer serious harm or
> physical restraint,
>
> shall be punished as provided in subsection (d).
>
> (b) *Whoever* knowingly benefits, financially or by receiving anything of
> value, from participation in a venture which has engaged in the
> providing or obtaining of labor or services . . . knowing or in reckless
> disregard of the fact that the venture has engaged in the providing or
> obtaining of labor or services by any of such means, shall be punished
> as provided in subsection (d).

18 U.S.C. § 1589 (emphasis added).  Similarly, the TVPRA's civil remedy provision

establishes a private cause of action against a "perpetrator" or "whoever" violates the

TVPRA:

6

An individual who is a victim of a violation of this chapter may bring a civil action against the *perpetrator* (or *whoever* knowingly benefits, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in an act in violation of this chapter) in an appropriate district court of the United States and may recover damages and reasonable attorneys fees.

*Id.* § 1595(a) (emphasis added). But the terms "perpetrator" and "whoever" are not defined by the statute, and standing alone, these broad terms signal no intent to abrogate sovereign immunity—certainly not an "unmistakably clear" congressional intent to do so. *See Atascadero*, 473 U.S. at 245-46 (concluding that statutory language creating liability for "any recipient" of federal assistance was not unmistakably clear intent to abrogate sovereign immunity); *see also Fla. Prepaid Postsecondary Educ. Expense Bd. v. Coll. Sav. Bank*, 527 U.S. 627, 631-32 (1999) (observing that previously undefined statutory language creating liability for "whoever" violated patent laws failed to abrogate sovereign immunity).

Nevertheless, the Mojsilovics contend there need not be an unmistakably clear statement of legislative intent because Congress enacted the TVPRA pursuant to its Thirteenth Amendment authority to eradicate slavery and involuntary servitude.[3] The Mojsilovics argue that the States surrendered sovereign immunity by ratifying the Thirteenth Amendment, which confers upon Congress plenary authority to abolish involuntary servitude, and as a consequence, there is no sovereign immunity for Congress to abrogate. *See* Aplt. Br. at 24 ("[T]he abrogation of sovereign immunity

---

[3] The Thirteenth Amendment provides that "[n]either slavery nor involuntary servitude . . . shall exist within the United States, or any place subject to their jurisdiction." U.S. Const. amend. XIII, § 1.

7

thus occurs within the Thirteenth Amendment itself, and it is therefore not necessary for Congress to further state its intent to abrogate the States' immunity.").

But the Mojsilovics' premise is incorrect: The TVPRA was not enacted under the Thirteenth Amendment; it was enacted under Congress's Commerce Clause powers. *See* H.R. Rep. No. 108-264(I), at 14 (2003) ("[T]he Committee finds the authority for [the TVPRA] in article I, section 8 of the Constitution."); 18 U.S.C. § 1591(a) (proscribing sex trafficking "in or affecting interstate or foreign commerce"); *see also Francisco v. Susano*, 525 F. App'x 828, 834 n.8 (10th Cir. 2013) (noting that predecessor statute to TVPRA was enacted under Congress's Commerce Clause powers); *Ditullio v. Boehm*, 662 F.3d 1091, 1097 n.4 (9th Cir. 2011) (same). This source of congressional authority is significant because "Congress may not abrogate the States' sovereign immunity pursuant to its Article I power over commerce." *Nev. Dep't of Human Res. v. Hibbs*, 538 U.S. 721, 727 (2003); *see Seminole Tribe*, 517 U.S. at 72-73 ("The Eleventh Amendment restricts the judicial power under Article III, and Article I cannot be used to circumvent the constitutional limitations placed upon federal jurisdiction."). Thus, even if Congress had intended to abrogate sovereign immunity in the TVPRA, it had no authority to do so under the Commerce Clause.

The Mojsilovics' arguments to the contrary are unavailing. To support their assertion that the TVPRA was enacted under the Thirteenth Amendment, they cite congressional findings for the TVPRA's predecessor statute reflecting the evils of human trafficking. *See* Pub. Law 106-386 §§ 102(b)(1), (12), (21) & (22), 114 Stat.

8

1464 (2000). Section 102(b)(1) states that "[t]rafficking in persons is a modern form of slavery, and it is the largest manifestation of slavery today." Section 102(b)(12) actually supports our conclusion that the TVPRA was enacted under the Commerce Clause, indicating that "[t]rafficking in persons substantially affects interstate and foreign commerce." Section 102(b)(21) states that "[t]rafficking of persons is an evil requiring concerted and vigorous action." And section 102(b)(22) states that the Declaration of Independence recognizes the "right to be free from slavery and involuntary servitude" as inalienable rights. But none of these findings demonstrate the TVPRA was enacted under the Thirteenth Amendment.[4]

The Mojsilovics also contend there need not always be a clear statement of congressional intent to abrogate sovereign immunity, as the Supreme Court endorsed in *Central Virginia Community College v. Katz*, 546 U.S. 356 (2006). *Katz* analyzed congressional power under the Bankruptcy Clause to subordinate State sovereign immunity in bankruptcy proceedings. *See id.* at 362. In that unique context, the Court explained, bankruptcy jurisdiction is "principally *in rem*" and as a consequence does not usually "interfere with state sovereignty even when States' interests are affected." *Id.* at 369-70. Yet, to the extent ancillary bankruptcy orders do implicate sovereign immunity, the evolution of the Bankruptcy Clause indicates the States

___

[4] In their reply brief, the Mojsilovics cite a non-binding district court decision, *see John Roe I v. Bridgestone Corp.*, 492 F. Supp. 2d 988, 1003 (S.D. Ind. 2007), and an unpublished magistrate judge's report and recommendation, *see United States v. Garcia*, No. 02-CR-110S-01, 2003 WL 22938040 (W.D.N.Y. Dec. 2, 2003) (unpublished), both suggesting the TVPRA was enacted under the Thirteenth Amendment. These decisions provide little or no supporting analysis, however, and we find neither decision authoritative.

agreed in ratifying the Constitution not to assert their immunity in bankruptcy proceedings. *Id.* at 364-70, 378.

Analogizing to *Katz*, the Mojsilovics contend the States ceded sovereign immunity by ratifying the Thirteenth Amendment. But as we have already discussed, the TVPRA was enacted under the Commerce Clause, which provides no congressional authority for abrogation. Thus, absent a valid source of constitutional authority to abrogate sovereign immunity and an unmistakably clear statement of congressional intent to do so, the district court correctly dismissed the Mojsilovics' TVPRA claim.

The judgment of the district court is affirmed.