Case affirmed by Supreme Court
opinion filed 5/28/02

Cert granted by Supreme Court on 10/15/01

**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

SOUTH CAROLINA STATE PORTS
AUTHORITY,
<u>Petitioner,</u>

v.

FEDERAL MARITIME COMMISSION;
UNITED STATESOF AMERICA,
<u>Respondents.</u>

STATE OF MARYLAND; STATEOF
ALABAMA; STATEOF ARKANSAS;
STATEOF CONNECTICUT; STATE OF
DELAWARE; STATEOF FLORIDA;

STATEOF GEORGIA; STATEOF IOWA;
STATEOF LOUISIANA; STATEOF
MAINE; STATEOF MISSISSIPPI;
STATEOF MONTANA; STATEOF
NEVADA; STATEOF NORTH CAROLINA;
STATEOF NORTH DAKOTA; STATEOF
OKLAHOMA; STATEOF OREGON;
STATEOF SOUTH CAROLINA;
STATEOF SOUTH DAKOTA; STATEOF
VIRGINIA; STATEOF WEST VIRGINIA;
NATIONAL ASSOCIATIONOF
WATERFRONT EMPLOYERS,
<u>Amici Curiae.</u>

No. 00-1481

On Petition for Review of an Order of the
Federal Maritime Commission.
(No. 99-21)

Argued: January 22, 2001

Decided: March 12, 2001

Before WILKINSON, Chief Judge, NIEMEYER, Circuit Judge, and Malcolm J. HOWARD, United States District Judge for the Eastern District of North Carolina, sitting by designation.

_____

Reversed and remanded with directions to dismiss by published opinion. Chief Judge Wilkinson wrote the opinion, in which Judge Niemeyer and Judge Howard joined.

_____

## COUNSEL

**ARGUED:** Warren LaForest Dean, Jr., THOMPSON COBURN, L.L.P., Washington, D.C., for Petitioner. Andrew Howard Baida, Assistant Attorney General, Baltimore, Maryland, for Amici Curiae. Phillip Christopher Hughey, FEDERAL MARITIME COMMISSION, Washington, D.C.; Alisa Beth Klein, Appellate Staff, Civil Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondents. **ON BRIEF:** Susan Taylor Wall, Elizabeth Herlong Campbell, NEXSEN, PRUET, JACOBS, POLLARD & ROBINSON, L.L.P., Charleston, South Carolina, for Petitioner. J. Joseph Curran, Jr., Attorney General of Maryland, Baltimore, Maryland, for Amici Curiae States. Thomas Panebianco, General Counsel, FEDERAL MARITIME COMMISSION, Washington, D.C., for Respondent Commission. David W. Ogden, Assistant Attorney General, J. Rene Josey, United States Attorney, Mark B. Stern, Appellate Staff, Civil Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent United States. Charles T. Carroll, Jr., Carl Larsen Taylor, Washington, D.C., for Amicus Curiae Association.

_____

## OPINION

WILKINSON, Chief Judge:

This case requires us to decide whether a state's sovereign immunity protects it from being brought before a federal administrative tri-

2

bunal by a private party. We hold that the state's immunity prevents such a suit or proceeding.

South Carolina Maritime Services, Inc. (Maritime Services), a cruise ship company, filed a complaint with the Federal Maritime Commission (FMC) against the South Carolina State Ports Authority (SCSPA). The suit sought reparations and injunctive relief for alleged violations of the Shipping Act of 1984, 46 U.S.C. app. § 1701 et seq. (1994). The FMC held that state sovereign immunity does not extend to private complaints filed before a federal agency. Because a state's sovereign immunity is not so fleeting as to depend upon the forum in which the state is sued, the judgment of the FMC is reversed and the case is remanded with directions to dismiss it.

I.

Maritime Services operates a cruise ship, the M/V TROPIC SEA. Passengers may gamble on board the ship while it is in international waters. The South Carolina State Ports Authority has a policy of refusing to berth ships whose primary purpose is gambling. The SCSPA allows some ships that permit gambling to berth, but only so long as gambling is not their primary purpose. The SCSPA refused to give the M/V TROPIC SEA a berthing space at the port of Charleston because it claimed the ship's primary purpose was to facilitate gambling.

Maritime Services, believing that it was being singled out for unfair treatment, filed a complaint with the FMC under the Shipping Act of 1984. The Shipping Act regulates the oceanborne foreign commerce of the United States. The Act prohibits discrimination by carriers and terminal operators and allows the FMC to regulate any agreement involving oceanborne foreign commerce. Id. §§ 1701(1), 1703(a) & (b). Maritime Services alleged that the SCSPA, as a terminal operator, had violated the Shipping Act by unreasonably refusing to deal and by unreasonably preferring other cruise ship companies to the disadvantage of Maritime Services. Id.§ 1709(b)(11) & (d)(3). The complaint asked for a cease and desist order, actual damages, interest, and attorney's fees.

The SCSPA's response raised, inter alia, the argument that South Carolina's sovereign immunity prohibits private parties from suing

3

the SCSPA before a federal agency. In support, the SCSPA noted that in <u>Ristow v. South Carolina Ports Authority</u>, 58 F.3d 1051 (4th Cir. 1995), this court held that the SCSPA is protected by South Carolina's sovereign immunity because it is an arm of the state. The ALJ agreed and dismissed the suit on sovereign immunity grounds. The FMC then reviewed the case on its own motion. In reversing the ALJ, the FMC held that sovereign immunity does not bar private suits against the states before federal agencies. The SCSPA now appeals.

II.

The doctrine of sovereign immunity predates the founding of our nation. <u>See</u> W. Blackstone, Commentaries on the Laws of England 234-35 (1765). And "[a]lthough the American people had rejected other aspects of English political theory, the doctrine that a sovereign could not be sued without its consent was universal in the States when the Constitution was drafted and ratified." <u>Alden v. Maine</u>, 527 U.S. 706, 715-16 (1999) (citing <u>Chisholm v. Georgia</u>, 2 U.S. (2 Dall.) 419, 434-35 (1793) (Iredell, J., dissenting)).

Notwithstanding the presumed universality of this doctrine, the Supreme Court held in 1793 that a private citizen of South Carolina could in fact sue the State of Georgia without its consent. <u>Chisholm</u>, 2 U.S. at 420. Justice Iredell dissented, contending that both before and after the adoption of the Constitution, the states maintained their sovereign right to be protected from suit without consent. <u>Id.</u> at 435-36, 448, 449-50 (Iredell, J., dissenting). The decision in <u>Chisholm</u> "fell upon the country with a profound shock" and was quickly overruled by the Eleventh Amendment. <u>Alden</u>, 527 U.S. at 720, 722 (internal quotations omitted).

The Eleventh Amendment provides that: "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. amend. XI. Although the literal text of the Amendment speaks only to suits filed by citizens of one state against another state, the Supreme Court held in <u>Hans v. Louisiana</u>, 134 U.S. 1, 21 (1890), that sovereign immunity barred a citizen from suing his own state without consent. This is because the principle of sovereign

4

immunity derives not just from the Eleventh Amendment, but from the structure and background principles of the Constitution. Hans, 134 U.S. at 11-12. It is with these background principles in mind that the Supreme Court decided two recent cases concerning state sovereign immunity: Seminole Tribe of Florida v. Florida, 517 U.S. 44 (1996), and Alden v. Maine, 527 U.S. 706 (1999). These two decisions provide significant guidance on how to resolve the underlying dispute.

A.

The Seminole Tribe case involved the Indian Gaming Regulation Act (IGRA), 25 U.S.C. § 2710(d), enacted under the Indian Commerce Clause. U.S. Const. art. I, § 8, cl. 3. Pursuant to the IGRA, the Seminole Tribe of Florida asked a federal district court to order the State of Florida to negotiate with the Tribe in good faith.

The Supreme Court affirmed the dismissal of the Tribe's suit, holding that Congress could not, in the exercise of its Article I powers, abrogate a state's sovereign immunity in federal court. 517 U.S. at 73. According to the Court, "the background principle of state sovereign immunity embodied in the Eleventh Amendment is not so ephemeral as to dissipate when the subject of the suit is an area . . . that is under the exclusive control of the Federal Government." Seminole Tribe, 517 U.S. at 72. Moreover, "[e]ven when the Constitution vests in Congress complete lawmaking authority over a particular area, the Eleventh Amendment prevents congressional authorization of suits by private parties against unconsenting States." Id. Noting that "[t]he Eleventh Amendment restricts the judicial power under Article III," the Supreme Court explained that "Article I cannot be used to circumvent the constitutional limitations placed upon federal jurisdiction." Id. at 72-73.

In reaching its decision, the Supreme Court held that the sovereign immunity principle is sufficiently strong that it transcends the literal text of the Eleventh Amendment and applies regardless of the type of relief sought. The Court noted that the Eleventh Amendment does not stand "`so much for what it says, but for the presupposition . . . which it confirms.'" Id. at 54. (quoting Blatchford v. Native Village of Noatak, 501 U.S. 775, 779 (1991)). The presupposition is that "each

5

State is a sovereign entity in our federal system" and that "`it is inherent in the nature of sovereignty not to be amenable to the suit of an individual'" without consent. Id. (quoting The Federalist No. 81, p. 487 (C. Rossiter ed. 1961) (A. Hamilton)). Thus the Eleventh Amendment merely confirmed, rather than established, the structural principle of state sovereign immunity. Accordingly, the Court concluded that the "`States of the Union, still possessing attributes of sovereignty, shall be immune from suits, without their consent, save where there has been a surrender of this immunity in the plan of the convention.'" Id. at 68 (quoting Principality of Monaco v. Mississippi, 292 U.S. 313, 322-23 (1934)).

With respect to the type of relief sought, Seminole Tribe held that the doctrine of sovereign immunity applies even if the suit against the state seeks no damages but only requests injunctive relief. According to the Court, "the type of relief sought is irrelevant to whether Congress has power to abrogate States' immunity." Id. at 58. This is because the "Eleventh Amendment does not exist solely in order to preven[t] federal-court judgments that must be paid out of a State's treasury, it also serves to avoid the indignity of subjecting a State to the coercive process of judicial tribunals at the instance of private parties." Id. (alteration in original) (internal quotations and citations omitted). Accordingly, the fact that the IGRA only authorized prospective injunctive relief was of no moment in determining the scope of Congress' abrogation authority.

B.

Alden v. Maine is the other recent sovereign immunity decision that informs our inquiry. A group of probation officers filed suit in federal court against the State of Maine. The officers alleged that the state had violated the Fair Labor Standards Act of 1938 (FLSA). Alden, 527 U.S. at 711. While that suit was pending, Seminole Tribe was decided and the federal complaint was dismissed. Id. at 712. The probation officers then filed the same action in state court because the FLSA authorized private state court actions against the states, regardless of consent. Id.

Just as Seminole Tribe held that state sovereign immunity transcends the type of relief sought, Alden held that the sovereign immu-

6

nity of the states transcends the forum in which the state is sued. Thus, the Court held that sovereign immunity bars suits in state courts just as it does in federal courts. According to the Supreme Court, "the powers delegated to Congress under Article I of the United States Constitution do not include the power to subject nonconsenting States to private suits for damages in state courts." Id.

Alden explained clearly why state sovereign immunity applies regardless of the forum in which the private action is prosecuted. According to the Court, "[p]rivate suits against nonconsenting States . . . present the indignity of subjecting a State to the coercive process of judicial tribunals at the instance of private parties, regardless of the forum." Id. at 749 (internal quotations and citations omitted). Compounding the harm is the fact that "[n]ot only must a State defend or default but also it must face the prospect of being thrust, by federal fiat and against its will, into the disfavored status of a debtor, subject to the power of private citizens to levy on its treasury or perhaps even government buildings or property which the State administers on the public's behalf." Id. Accordingly, Alden recognized that whether a state is entitled to sovereign immunity "does not turn on the forum in which the suits [are] prosecuted." Id. at 733. Rather, sovereign immunity applies whenever a private individual attempts to sue a nonconsenting state. Id.

In explicating this holding, Alden also reaffirmed the Seminole Tribe principle that state sovereign immunity extends beyond the text of the Eleventh Amendment. According to the Court,"[t]o rest on the words of the Amendment alone would be to engage in the type of ahistorical literalism" that has been rejected "since the discredited decision in Chisholm." Id. at 730 (citing Seminole Tribe, 517 U.S. at 68). In determining that sovereign immunity protected states from suits in their own courts, the Court found it irrelevant"that the Eleventh Amendment by its terms limits only `t]he Judicial power of the United States.'" Id. (alteration in original). Rather, Alden recognized that state sovereign immunity is an overarching principle of the Constitution. Id. at 713.

Instead of focusing on the literal terms of the Eleventh Amendment, the Court looked at the historical underpinnings of the doctrine of sovereign immunity. This historical inquiry yielded Alden's con-

7

clusion that sovereign immunity bars any private suit against a non-consenting sovereign. "The generation that designed and adopted our federal system considered immunity from private suits central to sovereign dignity." Id. at 715. As Alexander Hamilton explained: "`It is inherent in the nature of sovereignty not to be amenable to the suit of an individual without its consent. This is the general sense and the general practice of mankind; and the exemption, as one of the attributes of sovereignty, is now enjoyed by the government of every State in the Union.'" Id. at 716-17 (quoting The Federalist No. 81). Indeed, the antiquity of the doctrine is such that the Supreme Court found it "so often laid down and acknowledged by courts and jurists that it is hardly necessary to be formally asserted." Hans, 134 U.S. at 16.

Moreover, it is equally well established that sovereign immunity bars not just lawsuits filed in courts of law, but rather all proceedings against a non-consenting sovereign. Thus, the Court noted the "`presumption that no anomalous and unheard-of proceedings or suits were intended to be raised up by the Constitution -- anomalous and unheard of when the constitution was adopted.'" Alden, 527 U.S. at 727 (quoting Hans, 134 U.S. at 18). This language, referring to "proceedings or suits," makes it clear that certain proceedings, while not suits, are nevertheless barred by the doctrine of sovereign immunity. Alden cautioned, however, that the defense of sovereign immunity "does not confer upon the State a concomitant right to disregard the Constitution or valid federal law." Id. at 754-55. Rather, the "States and their officers are bound by obligations imposed by the Constitution and by federal statutes that comport with the constitutional design." Id. at 755.

Alden outlined six exceptions to the doctrine of sovereign immunity. First, sovereign immunity does not bar a suit where the state has given consent. Second, states remain subject to suits brought by the Federal Government or by other states. Third, Congress retains the power to abrogate the sovereign immunity of the states pursuant to the Fourteenth Amendment's Section 5 enforcement power. Fourth, sovereign immunity does not bar private suits against municipal corporations or other lesser governmental entities. Fifth is the Ex parte Young exception, 209 U.S. 123 (1908), which allows certain private suits against state officers if the suit seeks only injunctive or declara-

8

tory relief to remedy an ongoing violation of law. Sixth, state officers may be sued for money damages in their individual capacity, so long as the relief is sought from the officer personally. Alden, 527 U.S. at 755-57.

C.

Seminole Tribe and Alden make clear that state sovereign immunity, while not absolute, is among the Constitution's foremost principles. This constitutional commitment to dual sovereignty is no radical idea. As the Supreme Court has repeatedly explained, embedded in the structure of the Constitution is the principle that a private party may not file a complaint against an unconsenting state. With these lessons firmly in mind, we turn to the merits of the claim before us.

III.

The FMC and the United States argue that despite Seminole Tribe and Alden, sovereign immunity for the South Carolina State Ports Authority is inappropriate in this case. They posit two primary reasons for the SCSPA's lack of sovereign immunity. First, they contend that the FMC is not a court and thus does not exercise the judicial power of the United States. Second, they argue that the proceeding in front of the FMC is not a lawsuit. We address each contention in turn.

A.

The respondents FMC and the United States first assert that sovereign immunity does not apply in agency actions because agencies do not exercise the judicial power of the United States. See U.S. Const. amend. XI ("The Judicial power of the United States shall not be construed . . . ."). Since the FMC is an agency operating under the Executive Branch, and not a court, they argue that sovereign immunity is inapplicable in this case. They point out that the agency has no independent enforcement power.

The FMC and the United States contrast the powers exercised by the FMC here with the authority exercised by the Tax Court in Freytag v. Commissioner of Internal Revenue, 501 U.S. 868 (1991). In

9

*Freytag*, the Supreme Court held that the Tax Court, an Article I entity, "exercises its judicial power in much the same way as the federal district courts exercise theirs." Id. at 891. Because the Tax Court is "an adjudicative body" that can, inter alia, subpoena witnesses, order production of documents, administer oaths, grant certain injunctive relief, order the Secretary of the Treasury to refund an overpayment, and punish contempts by fine or imprisonment, the Tax Court is a Court of Law despite being part of the Executive Branch. Id. Thus, "[b]y resolving those disputes" between taxpayers and the Government, "the court exercises a portion of the judicial power of the United States." Id.

The FMC and the United States argue that the differences between the Tax Court and the adjudicative authority of the FMC make it clear that only the former is a court. The Tax Court, unlike the FMC, can enforce its orders. 46 U.S.C. app. § 1713(c) (Attorney General may seek enforcement by the district court of a subpoena issued by the FMC); id. § 1712(e) (Attorney General may seek recovery in district court of civil penalties assessed by the FMC). Moreover, the Tax Court only decides cases, whereas the FMC also exercises executive, legislative, and administrative responsibilities. Finally, respondents point out that while the Tax Court does not make political decisions, the FMC does.

Whether the FMC is exercising the judicial power as outlined in *Freytag*, however, is irrelevant to the disposition of this case. The central lesson from *Freytag* is that adjudication by adversarial proceedings can exist outside the context of Article III. *Freytag*, 501 U.S. at 889; accord id. (Congress has "wide discretion to assign the task of adjudication in cases arising under federal law to legislative tribunals"); id. at 910 (Scalia, J., concurring) ("It is true that Congress may commit the sorts of matters administrative law judges and other executive adjudicators now handle to Article III courts -- just as some of the matters now in Article III courts could instead be committed to executive adjudicators."). The precise limits of what does or does not constitute a court under *Freytag* are less important than the overarching principle *Freytag* establishes-- Article I tribunals may exercise the judicial power of the United States.

If Article I courts can indeed exercise the judicial power, it would seem anomalous to limit state sovereign immunity strictly to an Arti-

10

cle III proceeding. <u>Alden</u> in fact confirms that state sovereign immunity "is not directly related to the scope of the judicial power established by Article III." <u>Alden</u>, 527 U.S. at 730. Rather, it is a "separate and distinct structural principle" that "inheres in the system of federalism established by the Constitution." <u>Id.</u> And the Court has held that Congress can abrogate a state's sovereign immunity "only if there is `compelling evidence' that the States were required to surrender this power to Congress pursuant to the constitutional design." <u>Id.</u> at 731 (quoting <u>Blatchford</u>, 501 U.S. at 781).

No "compelling evidence" exists. To the contrary, <u>Alden</u> demonstrates that the founding generation understood the Constitution "to preserve the States' traditional immunity from private suits." 527 U.S. at 724. It was the spectre of private suits against the states that mattered to the founders, not the forums in which those suits might happen to be brought. At the time of ratification, the states were concerned about private citizens filing complaints against them without their consent. They understood that being subjected to such proceedings would affront a "fundamental aspect of [their] sovereignty." <u>Id.</u> at 713.

More practically, the states "`were heavily indebted as a result of the Revolutionary War. They were vitally interested in the question whether the creation of a new federal sovereign, with courts of its own, would automatically subject them, like lower English lords, to suits in the courts of the "higher" sovereign.'" <u>Id.</u> at 716 (quoting <u>Nevada v. Hall</u>, 440 U.S. 410, 418 (1979)). "It is indisputable that, at the time of the founding, many of the States could have been forced into insolvency but for their immunity from private suits for money damages." <u>Alden</u>, 527 U.S. at 750. In order to ensure passage of the Constitution, "[t]he leading advocates of the Constitution assured the people in no uncertain terms that the Constitution would not strip the States of sovereign immunity." <u>Id.</u> at 716; <u>accord id.</u> at 716-18 (citing founders such as Hamilton, Madison, and Marshall). The lesson from "the Constitution's structure, its history, and the authoritative interpretations" by the Supreme Court is unmistakable-- an adversarial proceeding against a non-consenting state by a private party triggers sovereign immunity. <u>Id.</u> at 713.

The United States nevertheless asserts that the federal government can create Article I tribunals by which it can subject unconsenting

11

states to proceedings by private parties. But would the founders have countenanced a system by which Congress could have avoided all the strictures of sovereign immunity by creating different tribunals where state sovereign immunity was completely inapplicable? To ask the question is to answer it. The states' concerns with affronts to their dignity and to the possibility of having to answer for their war debts would not disappear because the forum magically changed from an Article III court to an Article I tribunal. And while the coordinate branches of the federal government have the broadest latitude in organizing themselves as they see fit, they cannot employ an administrative structure that allows an end-run around the Constitution. Sovereign immunity is not so hollow a concept as to prohibit proceedings in certain fora like a federal or state court while at the same time permitting a similar proceeding to take place under the auspices of a legislative court or an agency adjudication. Dual sovereignty posits a relationship of mutual respect between Congress and the states. It is not consistent with that relationship for Congress to subject an unconsenting sovereign to the coercive club of private actions regardless of the forum. See id. at 733 ("The logic" of sovereign immunity decisions like Seminole Tribe "does not turn on the forum in which the suits were prosecuted.").

Alden makes clear that any proceeding where a federal officer adjudicates disputes between private parties and unconsenting states would not have passed muster at the time of the Constitution's passage nor after the ratification of the Eleventh Amendment. Such an adjudication is equally as invalid today, whether the forum be a state court, a federal court, or a federal administrative agency.

B.

The FMC and the United States also insist that sovereign immunity does not apply because the Article I proceeding in this case is not a "suit in law or equity." U.S. Const. amend. XI. Rather, they argue that the administrative adjudication is merely a form of regulation, in which political appointees attempt to effectuate the intent of a statute. The structure of the administrative proceeding, however, belies this point. Whether the proceeding is formally called an administrative action, a lawsuit, or an adjudication does not matter. The fundamental fact, which respondents cannot escape, is that this proceeding requires

12

an impartial federal officer to adjudicate a dispute brought by a private party against an unconsenting state.

It is important to examine the precise nature of this proceeding, and to describe what it is really like. The Shipping Act sets forth a regime by which "any person" may bring a formal "complaint alleging a violation" of the Act. 46 U.S.C. app. § 1710(a). The complaint may ask for "reparation for any injury caused to the complainant." Id. The party named in the complaint must either "satisfy[it] or answer it in writing." Id. § 1710(b). The Act then mandates that if the complaint is not satisfied (i.e., settled), "the Commission shall investigate it in an appropriate manner and make an appropriate order." Id. (emphasis added). The Commission, "upon complaint or upon its own motion, may" also investigate "any conduct or agreement that it believes may be in violation of" the Act. Id. § 1710(c).

The Act also provides that in "investigations and adjudicatory proceedings," any party may utilize "depositions, written interrogatories, and discovery procedures." Id. § 1711(a). To the extent practicable, the rules for these proceedings "shall be in conformity with the rules applicable in civil proceedings in the district courts of the United States." Id. The FMC may also use the subpoena power to "compel the attendance of witnesses and the production of books, papers, documents, and other evidence." Id. If a party does not comply with a nonreparation order or with a subpoena, the Attorney General of the United States "may seek enforcement by a United States district court having jurisdiction over the parties." Id. § 1713(c). If the Commission orders reparation, "the person to whom the award was made may seek enforcement of the order in a United States district court having jurisdiction over the parties." Id. § 1713(d)(1).

When a party files a formal complaint under 46 U.S.C. app. § 1710(a), the investigation takes the form of an adjudication. See 46 C.F.R. § 502.61 (2000). ALJs are the presiding officers for the initial adjudication. Id. § 502.223. The ALJ "designated to hear a case shall have authority" to, inter alia, "sign and issue subpenas [sic]", "take or cause depositions to be taken," "delineate the scope of a proceeding," "hear and rule upon motions," "administer oaths and affirmations," "examine witnesses," "rule upon offers of proof," "act upon petitions to intervene," "hear oral argument at the close of testimony,"

13

"fix the time for filing briefs, motions, and other documents," and "dispose of any other matter that normally and properly arises in the course of the proceedings." Id. § 502.147. Parties may, inter alia, depose witnesses, id. § 502.203; submit interrogatories, id. § 502.205; and submit requests for admission from opposing parties, id. § 502.207. The FMC reviews the ALJ's decision if a party requests an appeal or on the Commission's own initiative. Id. § 502.227.

The proceeding thus walks, talks, and squawks very much like a lawsuit. Its placement within the Executive Branch cannot blind us to the fact that the proceeding is truly an adjudication. The FMC and the United States argue, however, that despite the fact that the ALJ adjudicates the "case," id. § 502.147, and that the filing of a complaint necessarily "commence[s]" a "proceeding," id. § 502.61, the adjudication is in reality merely a form of regulation. The FMC and the United States contend that the agency simply uses adjudication as a means of implementing policy. The proceeding in their view is nothing more than an investigation of the merits of the claim. Indeed, they point out that the statute itself speaks in terms of "investigation." 46 U.S.C. app. § 1710(b). The FMC and the United States further maintain that the fact that only three commissioners of the FMC may come from the same party confirms that the agency's judicial function is only a means to implement its legislative objectives.

The adjudication, however, is just that -- an adjudication. An impartial officer presides in an adversarial proceeding to determine the rights and responsibilities of different parties. It is true that the commissioners may review the ALJ's decision. Nevertheless, this review is still impartial. See 5 U.S.C.§ 554(d) (requiring separation of functions between adjudication and prosecution in administrative hearings); 46 C.F.R. § 502.224 ("The separation of functions as required by 5 U.S.C. § 554(d) shall be observed in proceedings" under the Shipping Act). Moreover, the ALJ issues subpoenas, authorizes depositions, hears witnesses, and otherwise conducts the proceedings in a judicious manner. Administrative law judges are what the name says they are -- judges.

Indeed, the Supreme Court has recognized that ALJs are judges who decide cases. In Butz v. Economou, 438 U.S. 478, 511-14 (1978), the Court extended absolute judicial immunity to ALJs precisely

14

because ALJs perform judicial acts. The Court held that "adjudication within a federal administrative agency shares enough of the characteristics of the judicial process that those who participate in such adjudication should also be immune from suits for damages." Butz, 438 U.S. at 512-13. So as to leave no doubt, the Court noted that the "conflicts which federal hearing examiners seek to resolve are every bit as fractious as those which come to court." Id. at 513. It did not matter that the ALJs were "employees of the Executive Branch." Id. at 511. "Judges have absolute immunity not because of their particular location within the Government but because of the special nature of their responsibilities." Id.

The ALJ is thus not merely an alternate means of policy implementation. Rather, "the role of the modern federal hearing examiner or administrative law judge . . . is `functionally comparable' to that of a judge." Id. at 513. Like the situation in Butz, the judges and commissioners in the FMC independently judge the evidence before them. As the Butz Court stated, "the process of agency adjudication is currently structured so as to assure that the hearing examiner exercises his independent judgment on the evidence before him, free from pressures by the parties or other officials within the agency." Id. Although Article I adjudication undoubtedly differs from Article III adjudication, "federal administrative law requires that agency adjudication contain many of the same safeguards as are available in the judicial process." Id. (citing certain requirements of the Administrative Procedure Act, 5 U.S.C. §§ 554-557).

The FMC and the United States maintain, however, that the agency adjudication is merely an empty shell because the agency itself has no enforcement power. Only the Attorney General, they emphasize, has the discretion to enforce the FMC's non-reparation orders in district court. 46 U.S.C. app. § 1713(c). This argument, however, downplays the significance of the agency's own proceeding. The FMC and the United States ignore the fact that the Commission must hear all complaints filed with it. Id. § 1710(b). The Attorney General's discretion at the back end of the process simply does not help the unconsenting state up front. See Seminole Tribe, 517 U.S. at 58. Moreover, it is difficult to believe that the agency adjudication is so meaningless as to permit a private party to subject an unconsenting state to agency proceedings because of the adjudication's very emptiness.

15

It is true that under the Act, a state may choose to ignore a subpoena, an order, or a judgment. 46 U.S.C. app. § 1713(c). Yet a judgment or a subpoena against a state is a powerful thing, if not legally, then certainly politically. All parties, and certainly political entities such as states, have an interest in avoiding the stigma that attaches even to an unenforceable default judgment. Moreover, a state offends an agency that has plenary jurisdiction over its ports at its own peril. Indeed, the FMC may fine a state up to $25,000 per day for failure to comply with a Commission order. Id. § 1712(a). And the United States, through the Attorney General, can enforce these penalties in federal district court. Id. § 1712(e) (district court shall enforce the order unless it is "not regularly made or duly entered"). Furthermore, the ALJ could order (although not force) the state to be available for depositions, to answer interrogatories, and to produce documents. That the state may choose not to comply with the order does not change the fact that the state has already suffered an indignity to its sovereignty. See Alden, 527 U.S. at 713. The proverbial egg has already been broken.

Furthermore, the idea that a state would explicitly ignore any order of the federal government does not do justice to our system of federalism. State officers, no less than federal ones, take an oath to support and defend the Constitution and the laws of the United States. Id. at 715. The Supremacy Clause, of course, makes it clear that state officials have a duty to obey and enforce those same laws. See, e.g., Testa v. Katt, 330 U.S. 386, 391 (1947) ("[T]he Constitution and the laws passed pursuant to it are the supreme laws of the land, binding alike upon states, courts, and the people."). In short, we cannot base our opinion on the lack of FMC enforcement power because doing so would assume that state officers are unwilling on their own to obey an order of the United States. While enforcement power may be relevant to deciding whether a legislative court possesses the "judicial power" under Article III and Freytag, the question of whether sovereign immunity applies depends only on whether a private party can subject an unconsenting state to an adversarial proceeding. The Shipping Act, as well as Supreme Court decisions interpreting the role of administrative judges, underscores the fact that sovereign immunity applies to this agency adjudication.*

_____

*The United States also contends that the Supreme Court's "public rights" doctrine negates the suggestion that an agency adjudication is a

16

IV.

A.

Our holding that state sovereign immunity applies to agency adjudications does not end the inquiry. The Supreme Court has identified six exceptions to the doctrine of state sovereign immunity. See supra Section II.B. We address each in turn.

1.

The first exception to sovereign immunity is when the state gives its consent to suit. See, e.g., Alden, 527 U.S. at 755. This exception, of course, permits a state to redress the grievances of the complainant. However, it does so in a way that allows states to decide whether they want to be subject to a particular suit or class of suits. South Carolina has not given its consent to this lawsuit. It has not passed any law evincing an intent to be sued by a private party in these cases. Nor has it acquiesced to being sued in this particular case. Consequently, the consent exception does not apply to the case at bar.

_____

judicial action. Invoking the public rights doctrine, however, does not change the fact that a private party simply cannot commence an adversarial proceeding against an unconsenting state. Moreover, even in the public rights context the Supreme Court has been skeptical of allowing Article I tribunals to exceed the constitutional jurisdiction of Article III courts. See Thomas v. Union Carbide Agric. Prod. Co., 473 U.S. 568 (1985); Northern Pipeline Constr. Co. v. Marathon Pipe Line Co., 458 U.S. 50 (1982) (plurality opinion); Glidden v. Zdanok, 370 U.S. 530, 544-52 (1962); Crowell v. Benson, 285 U.S. 22 (1932); Murray's Lessee v. Hoboken Land & Improvement Co., 59 U.S. (18 How.) 272 (1856); American Ins. Co. v. Canter, 26 U.S. (1 Pet.) 511 (1828). Because an Article III court would not have jurisdiction due to state sovereign immunity, these and other cases suggest that sovereign immunity would also bar Congress from permitting a federal agency to force a state to defend a claim against a private party. Thus, even in the absence of Alden, sovereign immunity would likely bar the FMC from adjudicating Maritime Service's complaint against the SCSPA.

17

2.

The second exception is for cases brought against a state by the United States or by other states. See, e.g., id. at 755-56; Principality of Monaco, 292 U.S. at 328. A suit "commenced and prosecuted against a State in the name of the United States . .. differs in kind from the suit of an individual" in that the former was specifically contemplated in the design and framework of the Constitution. Alden, 527 U.S. at 755. Suits brought by the United States require the exercise of political responsibility. Id. at 756. They are less prone to be carried out solely to advance the agenda of a single individual. Id. Purely private suits, by contrast, lack this political constraint. The FMC and the United States argue that the discretion exercised by the Attorney General in deciding to enforce a Commission order transforms a proceeding by a private party into a discretionary action by the government. We disagree.

As previously discussed, the agency must hear all claims filed under 46 U.S.C. app. § 1710(a). It also has the ability to investigate cases upon its own motion, or upon the filing of a complaint. Id. § 1710(c). Indeed, under the Shipping Act and many other acts, the federal government may investigate a claim and simply bring a complaint in its own name. See, e.g., Kimel v. Florida Board of Regents, 528 U.S. 62, 78 (2000) (an agency can bring an action against a state under the ADEA even though a private individual cannot do so); see also EEOC v. Wyoming, 460 U.S. 226, 243 (1983) (agency brings suit against state under the ADEA); EEOC v. State of Illinois, 69 F.3d 167, 168 (7th Cir. 1995) (agency brings action against state on behalf of school teachers); Reich v. Alabama Dep't of Cons. & Nat. Resources, 28 F.3d 1076, 1078 (11th Cir. 1994) (Secretary of Labor brings action against state agency under the FLSA). In those cases, however, the named party would be the federal government, not a private party. This is not such a case. Here, a private party filed a complaint against an unconsenting state. The FMC had no choice but to adjudicate this dispute. The federal government must exercise "political responsibility for each suit prosecuted against a State." Alden, 527 U.S. at 756 (emphasis added). This responsibility was lacking in the case at bar. Consequently, the complaint was not brought by the federal government.

18

3.

The third exception to state sovereign immunity is for cases brought pursuant to Congress' enforcement power under Section Five of the Fourteenth Amendment. See Fitzpatrick v. Bitzer, 427 U.S. 445, 453 (1976); see also Board of Tr. of the Univ. of Alabama v. Garrett, 531 U.S. ___, No. 99-1240 slip op. at 6 (Feb. 21, 2001). The Fourteenth Amendment "required the States to surrender a portion of the sovereignty that had been preserved to them by the original Constitution" and "fundamentally altered the balance of state and federal power." Alden, 527 U.S. at 756 (internal quotation marks omitted). Respondents do not contest that the Shipping Act was enacted pursuant to Congress' Article I powers, as opposed to Congress' Section Five power. Thus, this exception does not apply to the case at bar.

4.

The fourth exception is for suits brought against lesser entities like municipal corporations that are not an arm of the state. See Alden, 527 U.S. at 756. The South Carolina State Ports Authority is indisputably an arm of the state itself. Ristow, 58 F.3d at 1053 ("[T]he Ports Authority, from an Eleventh Amendment perspective, is the alter ego of the State of South Carolina."). Consequently, this exception is inapplicable.

5.

The fifth exception to sovereign immunity is that in certain circumstances a private party may sue state officers in their official capacity to prevent ongoing violations of the law. See Ex parte Young, 209 U.S. at 123; see also Seminole Tribe, 517 U.S. at 73. This exception is irrelevant to the case at bar, as the private party brought the complaint for both legal and equitable relief against the State Ports Authority itself.

6.

Finally, sovereign immunity does not prevent an individual from suing state officers in their individual capacity for ultra vires conduct

19

fairly attributable to the officers themselves. <u>Alden</u>, 527 U.S. at 757. This exception is likewise inapplicable to the instant case.

B.

The FMC and its amicus urge us to create another exception to sovereign immunity, however. They argue that the federal interest in uniform regulation of maritime matters is sufficient reason to deny the states sovereign immunity over matters in front of the FMC. They argue that the Constitution itself, as well as Supreme Court cases, recognize the important federal interest in maintaining "a uniformity of regulation for maritime commerce." <u>United States v. Locke</u>, 529 U.S. 89, 108 (2000). In effect, the FMC and its amicus would have us hold that South Carolina consented to suits in matters affecting maritime commerce when it ratified the Constitution.

The Supreme Court in <u>Seminole Tribe</u> made clear that a strong federal interest in a particular subject matter cannot determine the application of sovereign immunity to a lawsuit. Indeed, the <u>Seminole Tribe</u> Court declared that "the background principle of state sovereign immunity embodied in the Eleventh Amendment is not so ephemeral as to dissipate when the subject of the suit is an area . . . that is under the exclusive control of the Federal Government." <u>Seminole Tribe</u>, 517 U.S. at 72. <u>Seminole Tribe</u> itself involved just such a matter -- the Constitution gives Congress exclusive control over the regulation of Indian commerce. <u>Id.</u> Nevertheless, "[e]ven when the Constitution vests in Congress complete lawmaking authority over a particular area, the Eleventh Amendment prevents congressional authorization of suits by private parties against unconsenting states." <u>Id.</u> Likewise, the fact that the Constitution assigns the federal government a primary role in the regulation of maritime commerce does not mean that Congress can authorize a private party to bring a complaint against an unconsenting state. Once sovereign immunity applies, the only exceptions are those recognized in <u>Alden</u>.

The federal government of course retains broad powers to regulate maritime matters. The FMC can bring a complaint in its own name. 46 U.S.C. app. § 1710(c). The FMC can, <u>inter alia</u>, bring suit in district court to enjoin conduct in violation of the Act. <u>Id.</u> § 1710(h). The FMC can investigate alleged violations of the Act upon its own initia-

20

tive or upon information supplied by a private party. Id. § 1710(c). The FMC may issue a cease and desist order if its investigation uncovers a violation of the Act. Id. § 1713. "Whoever" violates the Act or an FMC order "is liable to the United States for a civil penalty." Id. § 1712(a). Marine terminal operators like the South Carolina State Ports Authority must "establish, observe, and enforce just and reasonable regulations and practices . . . ." Id. § 1709(d)(1). The FMC can issue rules and regulations necessary to carry out the provisions of the Act. Id. § 1716. Indeed, if Congress so chose it could regulate all matters affecting ocean-borne commerce. U.S. Const. art. I., § 8, cl. 3; United States v. Lopez, 514 U.S. 549, 558 (1995) (Commerce Clause allows direct regulation of the channels of interstate commerce).

These and other methods show that disallowing private suits against unconsenting states will not vitiate the strong federal interest in regulating maritime commerce. The fact that sovereign immunity applies to private proceedings means only that the federal government, not a private party, must vindicate the federal interest when a state is involved. If the FMC needs more resources to ensure compliance by state agencies, Congress may of course authorize additional funds. This process ensures that any federal interest is protected in a politically accountable manner.

The FMC nevertheless argues that exempting states from having to respond to private complaints would give public maritime operators a competitive advantage over private maritime facilities. But we are not deciding this case based on maritime efficiencies or economic advantage. Rather, it is the structure of the Constitution that we are enforcing. If sovereign immunity confers upon state ports authorities some advantages that private ports authorities do not have, it is for the fundamental reason that the Constitution treats states differently. States are not just "mere prefectures or corporations." Alden, 527 U.S. at 758. They are sovereign entities which by definition have certain advantages that private actors do not have. Any competitive advantage that a state might have is not enough to justify treating states in a different manner than the Constitution specifies. Moreover, in this case it is unclear whether the states will be at a competitive advantage. The federal government retains numerous enforcement powers

21

and under the Supremacy Clause state officers must follow the Constitution and laws of the United States.

In short, the federal government itself may "deem the case of sufficient importance to take action against the State." Alden, 527 U.S. at 759-60. "Congress has ample means to ensure compliance with valid federal laws, but it must respect the sovereignty of the States." Id. at 758. What Congress simply cannot do under its Article I power is subject an unconsenting state to an adversarial proceeding brought by a private party.

V.

Sovereign immunity is not some outdated concept, an ancient appendage to the Constitution itself. Rather, respect for state sovereignty enables the states to best fulfill their continuing roles and responsibilities within our federal system. Sovereign immunity applies to proceedings brought in any forum by a private party against a non-consenting state. The history, the text, and the structure of the Constitution confirm that under its Article I powers, Congress cannot authorize private parties to haul unconsenting states before the adjudicative apparatus of federal agencies and commissions.

"The founding generation thought it `neither becoming nor convenient that the several States of the Union, invested with that large residuum of sovereignty which had not been delegated to the United States, should be summoned as defendants to answer the complaints of private persons.'" Alden, 527 U.S. at 748 (quoting In re Ayers, 123 U.S. 443, 505 (1887)). To hold otherwise would destroy the delicate equilibrium that is dual sovereignty.

For the foregoing reasons, the judgment of the Federal Maritime Commission is reversed and the case is remanded with directions to dismiss it.

REVERSED AND REMANDED WITH
DIRECTIONS TO DISMISS

22